219 F.3d 1087 (9th Cir. 2000)
 IRINA GORBACH; JOSE LUIS ROSAS-MADRID; AGUEDA ESCALANTE; RUBEN LARA; JAVIER SANGUINO; MAC MAURICE CHUKWUD IJEAKU; LORETO MONCADO JUAN; PEDRO LEGARDA-LEGARDA; ADOLPHO ERAZO, Plaintiffs-Appellees,
v.
JANET RENO, Attorney General of the United States; DORIS M. MEISSNER, Commissioner of Immigration and Naturalization Service; UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Defendants-Appellants.
 No. 98-35723
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted February 2, 1999--Seattle, Washington
Opinion Filed June 4, 1999
Rehearing En Banc Granted and Opinion Withdrawn October 19, 1999
Argued and Submitted March 23, 2000--San Francisco, California
Filed July 20, 2000
 [Copyrighted Material Omitted]
 Patricia Maher (argued) and Michelle R. Slack (briefed), United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington D.C., for the defendants-appellants.
 Jonathan S. Franklin, Hogan & Hartson L.L.P., Washington D.C., David J. Burman, Victor Cerda, Perkins Coie L.L.P., Seattle, WA, Robert H. Gibbs, Gibbs Houston Pauw, Seattle, Wa, Linton Joaquin, National Immigration Law Center, Los Angeles, CA, for the plaintiffs-appellees. Evelyn H. Cruz, Mark Silverman, Immigrant Legal Resource Center, San Francisco, CA, Meredith R. Brown, One Stop Immigration Center, Inc., Los Angeles, CA, of counsel
 Appeal from the United States District Court for the Western District of Washington, Barbara J. Rothstein, Chief District Judge, Presiding; D.C. No. CV-98-00278-R
 Before: Procter Hug, Jr., Chief Judge, James R. Browning, Mary M. Schroeder, Diarmuid F. O'Scannlain, Thomas G. Nelson, Andrew J. Kleinfeld, Michael Daly Hawkins, A. Wallace Tashima, Sidney R. Thomas, Susan P. Graber, and Kim McLane Wardlaw, Circuit Judges.
 Kleinfeld, J., delivered the opinion of the Court, which is joined in full by Chief Judge Hug, Judge Browning, Judge Schroeder, Judge O'Scannlain, Judge Graber, and Judge Wardlaw.
 KLEINFELD, Circuit Judge:
 
 
 1
 We must decide whether the power to confer citizenship through the process of naturalization necessarily includes the power to revoke that citizenship. We conclude that it does not.
 
 
 2
 Facts.
 
 
 3
 Traditionally new citizens have been naturalized in court. The governing statute used to confer exclusive jurisdiction to naturalize persons as citizens on district courts, territorial courts, and state courts of record.[1] This was changed in 1990. Now "[t]he sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General."[2] Courts may administer the oath of citizenship.[3] The oath is an essential element in the process of becoming a naturalized citizen, conducted in a public ceremony.[4] Some district courts arrange a memorable occasion, with welcomes from civic groups, and distribution by an INS agent of certificates of naturalization, but the power to naturalize plainly was shifted by the 1990 amendment from the courts to the INS.
 
 
 4
 Before the amendment, district judges used to sign an order that said, "It is hereby ordered that each of the beneficiaries so listed . . . is admitted to become a citizen of the United States of America."Now, if the oath is administered in court, a clerk of the court signs a certification that each applicant listed "appeared in open court at an oath administration ceremony . . . and having taken the oath of allegiance .. . was issued the Certificate of Naturalization . . . . " The certificate of naturalization is issued by the Commissioner of Immigration and Naturalization. It says that, "the Attorney General having found that" the person is entitled to citizenship and has met the requirements and taken the oath of allegiance, "such person is admitted as a citizen of the United States of America."[5]
 
 
 5
 The statute entitled "Revocation of Naturalization" says that United States attorneys shall institute actions to revoke naturalization, in appropriate circumstances, in United States District Courts.[6] The district court revocation procedure applies to any naturalization and certificate granted "under the provisions of this subchapter"[7] -which is to say, it applies to naturalizations and certificates granted by the Attorney General-as well as to any naturalizations and certificates granted by any court or the commissioner under prior law.[8] The "Revocation of Naturalization" section includes a subsection saying that nothing in the section limits the power of the Attorney General to reopen or vacate an order naturalizing a person.[9] This last subsection is the one on which the Attorney General rests her claim to authority in this case, and is set forth in full in text below. A subsequent section is entitled "Cancellation of certificates issued by Attorney General, the Commissioner or a Deputy Commissioner; action not to affect citizenship status."[10] It says that the Attorney General can "cancel" a certificate of citizenship on various grounds, but the cancellation "shall affect only the document and not the citizenship status of the person in whose name the certificate was issued."[11]
 
 
 6
 In 1996, well after the 1990 amendment shifted the power to naturalize new citizens from the courts to the Attorney General, the Attorney General issued regulations for revocation of naturalization.[12] They purport to be based on her general authority to administer the immigration laws. The "authority" notation on the regulations cites the provisions on her general administrative duties[13] and her duties regarding administration of naturalization provision.[14] The latter provides for examining applicants, instructing on citizenship, administering oaths and publishing forms, filing records, and furnishing quarters for photographic studios so that applicants can get the necessary photographs taken. It speaks to certificates of naturalization or of citizenship by saying that the Attorney General's certificates shall have the same effect in all courts as certificates issued by courts with jurisdiction[15].
 
 
 7
 The new regulations say that, "[o]n its own motion, the Service may reopen a naturalization proceeding and revoke naturalization" in various circumstances.[16] The circumstances overlap the circumstances for which the Attorney General must bring actions in district court to revoke naturalizations. The Attorney General gives district directors two years from the orderconferring citizenship to give notice of intent to reopen.[17]
 
 
 8
 This case arises out of the new regulations. Ten naturalized citizens, who had been served with notices of intent to revoke naturalization, under the new regulations, sued for a preliminary injunction to prevent the Attorney General from proceeding under the new regulations. The district court enjoined the INS from initiating or continuing administrative denaturalization proceedings under the new regulations pending final resolution of the case. The district judge also granted a "nationwide class certification," making the Attorney General's injunction effective for the entire country.
 
 
 9
 The INS brought an interlocutory appeal[18] and initially prevailed.[19] But we decided to rehear the case en banc.[20] This decision is substituted for the decision of the three-judge panel.
 
 
 10
 A district court's decision to grant a preliminary injunction is generally reviewed for an abuse of discretion.[21] However, "if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance," the court may undertake "plenary review of [the] issues" rather than "limit its review in a case of this kind to abuse of discretion."[22] We do so in this case, and hold that the regulation providing for administrative revocation of citizenship[23] is void because of the absence of statutory authority for it.
 
 
 11
 Analysis.
 
 
 12
 The INS has a tough argument to make. It is basically that, even though Congress expressly provided for denaturalizations only in actions by United States attorneys in courts, nevertheless the saving clause in the statute implied that, by shifting the power of naturalization to the Attorney General, Congress also shifted to her jurisdiction, partially concurrent with district court jurisdiction, the power to denaturalize. Because the power to denaturalize is so important, and because it differs as a practical matter from the power to naturalize, we conclude that this silent and subtle implication is too weak to support this argument.
 
 I.
 
 13
 The Attorney General argues that the naturalized citizens who have been issued notices of intent to revoke their naturalization lack standing to challenge her authority to issue the regulations, because the notice by itself does not affect their citizenship, and that there is no ripe case or controversy, because the plaintiffs had not completed the administrative proceedings when they filed their lawsuit. This case is not in the subjunctive. The new regulations have actually been invoked against the plaintiffs. They are not merelypersons who might be affected if the procedures were invoked against them[24]. We conclude that, because these are individuals against whom proceedings are pending under the new regulations, and who would have to defend themselves effectively or lose their citizenship in the administrative proceedings were it not for the injunction that they have obtained, they have standing to challenge the authority of the Attorney General to promulgate the new regulations. The burden of being forced through a governmental administrative challenge to something as important as one's citizenship is sufficiently particularized and concrete to confer standing to challenge the Attorney General's authority to impose the administrative proceeding[25].
 
 
 14
 For like reasons, there is an actual controversy regarding procedural injury that is ripe for adjudication. The government argues that the controversy is not ripe for adjudication until these individuals complete their defenses of their citizenship in administrative proceedings. We reject that argument because it is the authority of the INS to put the plaintiffs through those administrative proceedings, rather than the substantive accuracy of the INS challenges to their citizenship, that is at issue.[26] No factual evidence that might be developed in the administrative proceedings could contribute to resolution of the legal dispute, which distinguishes Toilet Goods Association v. Gardner.[27]
 
 II.
 
 15
 The government also urges that the district court did not properly apply the ordinary requirements of balancing hardships and requiring bond for a preliminary injunction. The government urges that the injunction imposes the hardship that it cannot do what is enjoined, revoke naturalization administratively, without filing actions in court, a proposition that is obvious and true. But the district judge was within her discretion in concluding that that hardship was outweighed by the hardship to all the new citizens who might otherwise be subjected to burdensome and threatening administrative proceedings not authorized by law. Where it is important to commence proceedings to revoke naturalization promptly, as where evidence may disappear, the injunction does not impose delay, because the government is free to proceed in district court under the explicit and unchallenged provisions of the statute. The government argues that the district judge abused her discretion by not requiring a bond, but the purpose of such a bond is to cover any costs or damages suffered by the government, arising from a wrongful injunction, and the government did not show that there would be any.[28]
 
 III.
 
 16
 Because "[a]n agency may notconfer power upon itself,"[29] the Attorney General needs some statutory authority to have the power to take away an individual's American citizenship. Thus we begin (and ultimately end) by seeking in the relevant statutes some express or implied delegation of authority to the Attorney General to revoke the citizenship of a naturalized American citizen.
 
 
 17
 The Attorney General makes a cursory reference to Chevron v. Natural Resources Defense Council[30] for the proposition that her action in promulgating the regulation at issue is "entitled to considerable deference," but does not develop the argument beyond that. As we explain below, Congress has not "explicitly left a gap for the agency to fill," or made an "implicit" delegation to an agency, which would require Chevron deference.[31] Nor is the statute "silent" with respect to "the specific issue" of denaturalization, which would, other things being equal, require Chevron deference.[32] Arguably, as we explain below, a saving clause in the statute might create an ambiguity that would require courts to yield to the agency's interpretation if it were a "permissible construction,"[33] but the construction urged is not a permissible one in light of the language of the statute and the well established construction of the statutory scheme. An agency ordinarily entitled to Chevron deference "may not exercise its authority `in a manner that is inconsistent with the administrative structure that Congress enacted into law.' "[34] A particular statutory provision must be read in context with a view to its place in the statutory scheme, not in isolation,[35] and read in context, the statute is unambiguous in not conferring upon the Attorney General the power to denaturalize citizens administratively. Part of the context in which the statute must be construed is that in the long history of naturalization and denaturalization procedures, the Attorney General has not had the power to denaturalize citizens administratively, and the Supreme Court has rejected arguments that authority to denaturalize ought to be inferred from silence or "inherent" authority. Chevron deference "is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gap."[36] That theory does not apply in the context of this statute taken historically and as a whole, because the context leaves no room to infer an implicit delegation, so there is no room for Chevron deference.
 
 
 18
 The delegation that Congress expressly made to the Attorney General was of "authority to naturalize " citizens.[37] There is no express delegation in the statutes to the Attorney General to denaturalize citizens. There is an express delegation to cancel "certificates of citizenship," but the statute on cancellation cuts against the government's argument of an implied delegation, because Congress expressly provided that such cancellations "shall affect only the document and not the citizenship status."[38]
 
 
 19
 There is an express statutory procedure for denaturalization. The statute says thatUnited States attorneys are supposed to bring proceedings "in any district court."[39] Thus the express scheme plainly and unambiguously gives the Attorney General the power to naturalize citizens and to cancel certificates of citizenship but not the citizenship itself, and plainly and unambiguously gives to district courts the power to denaturalize citizens.
 
 
 20
 The only statutory language from which the Attorney General infers a power to denaturalize is a saving clause: "Nothing contained in this section shall be regarded as limiting, denying, or restricting the power of the Attorney General to correct, reopen, alter, modify, or vacate an order naturalizing the person."[40] This is a saving clause. A saving clause does not create anything; it merely preserves from repeal what is already there.
 
 
 21
 As in United States v. Locke,[41] treating the saving clause as a transfer of power "placed more weight on the saving clauses than those provisions can bear."[42] This saving clause protects such powers as the Attorney General has from a construction "limiting, denying, or restricting" that power. But this clause does not expressly grant any power. Absence of implied repeal does not amount to creation of some new power. Under the saving clause, what authority the Attorney General has, she keeps, but it does not give her more.
 
 
 22
 In analogous circumstances, the Supreme Court said:
 
 
 23
 We think it quite unlikely that Congress would use a means so indirect as the saving clauses in Title I of OPA to upset the settled division of authority by allowing states to impose additional unique substan tive regulation on the at-sea conduct of vessels. We decline to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.[43]
 
 
 24
 Likewise here, there is an established and carefully constructed scheme: the Attorney General naturalizes, the district courts denaturalize, and the Attorney General can cancel certificates but the cancellations affect only the certificates and not citizenship itself. And likewise here, implying authority for the Attorney General to take away people's citizenship administratively would gravely upset this carefully constructed legislative arrangement.
 
 
 25
 It is not even clear that the Attorney General issues an "order," other than and distinct from the certificate of naturalization. The statute says that canceling a certificate does not revoke citizenship, and the saving clause preserves whatever power the Attorney General has to revoke "an order" but not the certificate. All the newly naturalized citizen gets is a certificate. There is no longer an order filed in the district court, as there used to be before the 1990 amendment. The certificate does not say that it is an order, or that an order has been signed or filed anywhere, just that the individual has met the requirements and, "having taken the oath,""is admitted as a citizen."[44] The statute says that a naturalized citizen is entitled to a certificate that includes a "statement that the Attorney General, having found [the various requirements to have been fulfilled], thereupon ordered that the applicant be admitted as a citizen."[45] The order could not be issued before the oath of allegiance, nothing so far as the record or regulations show appears to be issued after the oath except for the certificate, and the certificate does notpurport to be an order or to certify that there is an order other than the certificate itself. If there is no order separate from the certificate, then the saving clause, which refers to the power to "vacate an order," has nothing to save.
 
 
 26
 The heart of the Attorney General's argument is that the power to denaturalize is "inherent" in the power to naturalize. There is no reason why that should be so. There is no general principle that what one can do, one can undo. It sounds good, just as the Beatles' lyrics-"Nothing you can know that isn't known/ Nothing you can see that isn't shown/ Nowhere you can be that isn't where you're meant to be,"[46] -sound good. But as Sportin' Life said, "It ain't necessarily so."[47] Congress has confirmed the traditional inherent power of United States District Courts to vacate their own judgments.[48] But there is no statutory confirmation of any inherent power the Immigration and Naturalization Service may have to vacate its judgments, except for its narrow authority to cancel certificates without affecting citizenship.[49] If the power of courts to vacate their own judgments needs confirmation by an express rule approved by Congress, it is too much to infer an analogous power in the Attorney General, for so weighty a matter as revocation of American citizenship, from silence. The formula the government urges, that what one can do, one can undo, is sometimes true, sometimes not. A person can give a gift, but cannot take it back. A minister, priest, or rabbi can marry people, but cannot grant divorces and annulments for civil purposes. A jury can acquit, but cannot revoke its acquittal and convict. Whether the Attorney General can undo what she has the power to do, naturalize citizens, depends on whether Congress said she could.
 
 
 27
 If practicality required that the power to undo naturalization resides in the same agency as the power to naturalize, then we might infer that Congress intended to give that power to the Attorney General. The inference would rest on the implicit principle that Congress is presumed to do what makes sense. But there is no practical sense in supposing that, because the Attorney General can naturalize, she needs to have the power to denaturalize. The former power is typically exercised wholesale, the latter retail. An administrative agency is useful for performing large numbers of repetitive, routine tasks (from the agency's viewpoint, not the new citizen's), such as naturalization, that do not take away important liberties from individuals. But administrative agencies, accustomed to treating a case as " `one unit in a mass of related cases,' "[50] are dubious instruments for performing relatively rare acts catastrophic to the interests of the individuals on whom they are performed.
 
 
 28
 If the Attorney General errs at a high rate in the high volume business of naturalization, Congress might sensibly delegate naturalization power to her, because the courts could not handle the volume and the errors would be bearable, but conclude that the courts ought to handle denaturalization, because there are fewer de-naturalizations and they affect individual liberty too severely to tolerate a high error rate. The Attorney General's own auditors reported that the INS made at least one processing error in nine out of ten of the naturalization cases sampled. "In 90.8% of the cases reviewed, INS and KPMG found that INS had made at least one processing error, with an average of two errors per case."[51] Although many ormost errors might not lead to an erroneous result, the audit reported that 3.7 percent of the naturalizations were erroneous in result.[52] The Justice Department is now seeking to revoke the naturalizations that it performed on 369 of the 1,049,867 people it naturalized from August 1995 through September 1996, and is reviewing another 5,954 for possible denaturalization proceedings.[53]
 
 
 29
 These numbers vitiate any argument that Congress must have intended to give the Attorney General the power to denaturalize, as a matter of practicality, when it gave her the power to naturalize. The federal judiciary could not have processed a million extra cases, even routine ones, in twelve months, but there is no reason to doubt that it can handle the few hundred, or at most a few thousand, de-naturalizations that result from high volume, high-error-rate naturalizations. It is at least as reasonable to think that Congress would delegate the power to naturalize to an administrative agency, and lodge the power to denaturalize in district courts, based on the number of cases and the relative risks to individual liberty in the two kinds of cases, as it is to think that it intended to delegate both powers to the administrative agency.
 
 
 30
 Historically, Congress and the Supreme Court have been sensitive to the risk that the naturalization power might be improperly politicized. Indeed, the Declaration of Independence criticized the King of England for improperly politicizing naturalization: "He has endeavored to prevent the Population of these States; for that Purpose obstructing the Laws for Naturalization of Foreigners . . . ."[54] The Supreme Court has, partly for that reason, construed the denaturalization statutes in such a way as to avoid delegation except to federal courts, except where an alternative delegation was clearly and unambiguously expressed. The Court said in Bindczyck v. Finucane[55] that "elections could be influenced by irregular de-naturalizations as well as by fraudulent naturalizations."[56] The Court gave the example, from a century ago, of how a "judge who had naturalized seven aliens on the supposition that they were members of his own political party promptly vacated his order when this supposition was corrected."[57] This risk of politicization of denaturalization was among the reasons why the Court in Bindczyck refused to infer the power to denaturalize from the power to naturalize.
 
 
 31
 Bindczyck is analogous to this case. Under the statute then in effect, state courts had the power to naturalize citizens, and the question was whether they therefore had the power to denaturalize, by vacating their own orders of naturalization when procured by fraud. This question is precisely analogous to the issue before us: does the power to naturalize carry with it an inherent power to denaturalize. The answer was (and is): No. The Court in Bindczyck said that, despite their power to naturalize, the state courts did not have power to denaturalize. The Court rejected the argument that a court's inherent power to vacate its own judgments included a power to denaturalize. It held that the statute giving the Attorney General the duty to institute denaturalization proceedings[58] in certain designated courts was "a carefully safeguarded method for denaturalization"[59]and that the government's statutory right to appear at any naturalization and the power of district courts to revoke naturalizations "provided a complete and exclusive framework for safeguarding citizenship against unqualified applicants."[60]
 
 
 32
 Bindczyck forcefully rejects the argument (analogous to the one the Attorney General now makes) that (1) a grant of citizenship is a judgment; (2) an issuing court may revoke its own judgments for fraud; so (3) a state court that granted a judgment of naturalization may vacate its own judgment for fraud. The Court calls this "mechanical jurisprudence in its most glittering form" that "disregards the capricious and haphazard results that would flow from applying such an empty syllogism to the actualities of judicial administration."[61]
 
 
 33
 Congress changed the law construed in Bindczyck by expressly conferring on state courts the power to revoke naturalizations that they had granted. A Second Circuit case said Bindczyck was "overruled" by the statutory change,[62] but obviously Congress cannot "overrule" Supreme Court decisions. What Congress did was to change the statute that Bindczyck had construed by expressly conferring the previously omitted authority. The Supreme Court, in United States v. Zucca,[63] expressly repudiated the notion that Bindczyck was overruled or rendered irrelevant by the statutory amendment, by declaring that "[t]he underlying philosophy of Bindczyck remains intact" despite the "abrogation[ion]" of the specific holding about state courts by the statutory change.[64]
 
 
 34
 That philosophy emphasizes the importance of citizenship and the safeguards against taking it away. In Zucca, where the denaturalization statute had prescribed how United States attorneys should file a case (with an affidavit), the Court held that the United States attorneys could not also file in the usual way (without an affidavit).[65] The "underlying philosophy of Bindczyck" that Zucca says "remains intact" is "safeguarding citizenship from abrogation except by a clearly defined procedure,"[66] --"clearly defined," that is, by statute. Zucca applied the Bindczyck holding that the statutory denaturalization procedure was "a self-contained, exclusive procedure" that "covers the whole ground."[67] That means, for this case, that the denaturalization procedure defined in 8 U.S.C. S 1451(a) is "exclusive" and "covers the whole ground."
 
 
 35
 In United States v. Minker[68] the Court said that denaturalization "may result in loss of both property and life; or of all that makes life worth living."[69] Minker adopts the rule that "where there is doubt it must be resolved in the citizen's favor."[70] This holding, as applied to the case at bar, means that, if there is doubt whether the statute confers the power on the Attorney General to denaturalize, or leaves it exclusively in the district courts, the doubt must be resolved against the Attorney General. Even straining logic charitably in the Attorney General's favor,the best we can say of the Attorney General's proposed inference of a delegation of power from a saving clause in the case at bar is that it is leaves some doubt, so the doubt "must be resolved in the citizen's favor" under Minker. Any question whether that applies to administrative agencies is answered by Minker's next sentence: "Especially must we be sensitive to the citizen's rights where the proceeding is nonjudicial, because of `[t]he difference in security of judicial over administrative action . . . .' "[71]
 
 
 36
 All these principles of construction -that the statutory denaturalization procedure exhausts the field, that the power to naturalize does not imply a power to denaturalize, that doubts are to be resolved in the naturalized citizen's favor, and that administrative action is to be deemed less secure than judicial -remain the law. The 1990 statutory amendments shifted the power to naturalize citizens from federal and state courts to the Attorney General, but left intact the district court denaturalization proceeding.[72] The amendments also changed the saving clause, from one that saved to state and federal courts whatever power they had to vacate their own judgments with respect to naturalizations, to a new version that saved to the Attorney General whatever power she had.[73] This change in the saving clause is insufficient to accomplish a delegation, in the face of the holdings in Bindczyck, Zucca, and Minker.
 
 
 37
 The Attorney General's argument, that Congress would not have written a saving clause if there were nothing to save, would have more force were it not for the gloss provided by the controlling Supreme Court decisions. But this weak inference of a delegation cannot be drawn in the face of the Supreme Court cases holding that the express statutory procedure is exclusive and fully occupies the field. Nor can it necessarily be said that the alternative is to construe the saving clause as having no meaning. Possibly the agency has authority to correct clerical errors shortly after they are made, which authority the saving clause preserves, and certainly it has the other powers described in the saving clause, such as to reopen and correct naturalizations for errors such as misspelled and mis-designated names.
 
 
 38
 Were we to infer a negative pregnant, we might do so more readily from the limitation on the Attorney General's power regarding cancellation of a certificate of citizenship. Congress provided that the Attorney General can cancel a certificate fraudulently obtained, but the cancellation "shall affect only the document and not the citizenship status of the person in whose name the document was issued."[74] It is hard to see why Congress would limit cancellations in this way, unless the statutory procedure for denaturalization in federal district courts remains the exclusive means of revoking the citizenship of an individual who has been naturalized. The most that Congress gave the Attorney General regarding the power to denaturalize is silence, and "[n]ow and then silence is not pregnant."[75]
 
 Conclusion
 
 39
 Citizenship in the United States of America is among our most valuable rights. For many of us, it is all that protects our life, liberty, and property from arbitrary deprivation. The world is full of miserable governments that protect none of these rights. Many of us would be dead or never conceived in wretched places in other countries, had we or our ancestors not obtained American citizenship.The opportunities that we want to pass on to our children depend on their secure rights to stay in this country and enjoy its guarantees of life, liberty, and property, and the domestic peace and prosperity that flow from those guarantees. An executive department cannot simply decide, without express statutory authorization, to create an internal executive procedure to deprive people of those rights without even going to court. For the Attorney General to gain the terrible power to take citizenship away without going to court, she needs Congress to say so. The district court correctly held that the new regulations for administrative denaturalization were promulgated without authority from Congress. Congress has provided one way to revoke the citizenship of a naturalized American citizen: that is for a United States Attorney to file a petition in a United States District Court. There is no statutory warrant for a second way, whereby the Immigration and Naturalization Service would revoke a person's citizenship administratively.
 
 
 40
 The order granting the preliminary injunction is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 8 U.S.C. S 1421(a) (1970), amended by 8 U.S.C. S 1421(a) (1990).
 
 
 [2]
 8 U.S.C. S 1421(a) (1990).
 
 
 [3]
 8 U.S.C. S 1421(b).
 
 
 [4]
 8 U.S.C. S 1448(a).
 
 
 [5]
 Immigration and Naturalization Service, Certificate of Naturalization, N-550 rev. 6-91.
 
 
 [6]
 8 U.S.C. S 1451(a).
 
 
 [7]
 8 U.S.C. S 1451(g).
 
 
 [8]
 Id.
 
 
 [9]
 8 U.S.C. S 1451(h).
 
 
 [10]
 8 U.S.C. S 1453.
 
 
 [11]
 Id.
 
 
 [12]
 8 C.F.R. S 340.1.
 
 
 [13]
 8 U.S.C. S 1103.
 
 
 [14]
 8 U.S.C. S 1443.
 
 
 [15]
 8 U.S.C. S 1443(e).
 
 
 [16]
 8 C.F.R. S 340.1.
 
 
 [17]
 8 C.F.R. S 340.1(b). The regulations further provide that "the applicant bears the burden" of proving eligibility for naturalization. 8 C.F.R. S 340.1(b)(6). The Department of Justice has sent us a letter pursuant to Fed. R. App. P. 28(j), saying that, a week after oral argument in our rehearing en banc, it issued an interim rule (with request for comments) shifting the burden of proof from the applicant to the INS, and raising it to "clear, convincing, and unequivocal" evidence. 65 Fed. Reg. 17127-1, 2000 WL 331208 (F.R.).
 
 
 [18]
 28 U.S.C. S 1292.
 
 
 [19]
 Gorbach v. Reno, 179 F.3d 1111 (9th Cir. 1999).
 
 
 [20]
 Gorbach v. Reno, 192 F.3d 1329 (9th Cir. 1999).
 
 
 [21]
 Bay Area Addiction Research and Treatment, Inc. v. City of Antioch, 179 F.3d 725, 732 (9th Cir. 1999).
 
 
 [22]
 Thornburgh v. America College of Obstetricians and Gynecologists, 476 U.S. 747, 755-57 (1986), overruled in part on other grounds, Planned Parenthood v. Casey, 505 U.S. 833 (1992).
 
 
 [23]
 8 C.F.R. S 340.1.
 
 
 [24]
 Circumstances changed as to some plaintiffs after suit was filed. The INS sua sponte issued an order confirming the naturalization of Irina Gorbach, the lead plaintiff. As to two plaintiffs, the INS withdrew its notices of intent to revoke naturalization, but did not confirm their naturalizations. So far as the record reflects, the other plaintiffs are still persons against whom the revocation procedure in the new regulations remains pending. See Sosna v. Iowa, 419 U.S. 393, 402 (1975) (holding that a class action does not become moot merely because it has become moot as to a named plaintiff).
 
 
 [25]
 See Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57-58 (1993); Yesler Terrace Community Council v. Cisneros, 37 F.3d 442, 445-46 (9th Cir. 1994).
 
 
 [26]
 See Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619, 626 n.1 (1986); Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 579-82 (1985); Southern Cal. Edison Co. v. FERC, 770 F.2d 779 (9th Cir. 1985).
 
 
 [27]
 387 U.S. 158 (1967); cf. Time Warner Entertainment Co. v. FCC, 93 F.3d 957, 974 (D.C. Cir. 1996).
 
 
 [28]
 Fed. R. Civ. P. 65(c).
 
 
 [29]
 International Ass'n of Indep. Tanker Owners (Intertanko) v. Locke, 148 F.3d 1053, 1068 (9th Cir. 1998) (quoting Louisiana Pub. Serv. Comm'n. v. FCC, 476 U.S. 355, 374-75 (1986)), rev'd on other grounds sub nom. United States v. Locke, 120 S. Ct. 1135 (2000).
 
 
 [30]
 Chevron v. Natural Resources Defense Council, 467 U.S. 837 (1984).
 
 
 [31]
 Id. at 843-44.
 
 
 [32]
 Id. at 843.
 
 
 [33]
 Id.
 
 
 [34]
 Food and Drug Administration v. Brown & Williamson Tobacco Corp., _______ U.S. _______, 120 S.Ct. 1291 (2000).
 
 
 [35]
 Id. at 1300-01.
 
 
 [36]
 Id. at 1314.
 
 
 [37]
 8 U.S.C. S 1421(a).
 
 
 [38]
 8 U.S.C. S 1453.
 
 
 [39]
 8 U.S.C. S 1451(a).
 
 
 [40]
 8 U.S.C. S 1451(h).
 
 
 [41]
 120 S. Ct. 1135 (2000); see also Intertanko, 148 F.3d at 1068.
 
 
 [42]
 Locke, 120 S. Ct. at 1146.
 
 
 [43]
 Id. at 1147.
 
 
 [44]
 Immigration and Naturalization Service, Certificate of Naturalization, N-550 rev. 6-91.
 
 
 [45]
 8 U.S.C. S 1449.
 
 
 [46]
 The Beatles, All You Need is Love, on Magical Mystery Tour (EMD/ Capitol 1967).
 
 
 [47]
 George Gershwin, Porgy and Bess (1934).
 
 
 [48]
 Fed. R. Civ. P. 60.
 
 
 [49]
 8 U.S.C. S 1453.
 
 
 [50]
 Castillo-Villagra v. INS, 972 F.2d 1017, 1026 (9th Cir. 1992) (quoting Walter Gellhorn, Official Notice in Administrative Adjudication, 20 Tex. L. Rev. 131, 136 (1941)).
 
 
 [51]
 Department of Justice, INS and KPMG Peat Marwick Complete Review of August 1995, -September 1996 Naturalizations at 3 (Feb. 9, 1998) (press release) (introducing KPMG final audit of naturalization of 1.049,867 individuals from August 1995 through September 1996).
 
 
 [52]
 Id. at 4.
 
 
 [53]
 Id. at 1-2.
 
 
 [54]
 The Declaration of Independence para. 9 (U.S. 1776).
 
 
 [55]
 342 U.S. 76 (1951).
 
 
 [56]
 Id. at 82.
 
 
 [57]
 Id. at 82-83.
 
 
 [58]
 8 U.S.C. S 738 (the predecessor to 8 U.S.C. S 1451(a)).
 
 
 [59]
 Bindczyck, 342 U.S. at 81.
 
 
 [60]
 Id. at 84.
 
 
 [61]
 Id. at 85.
 
 
 [62]
 Simons v. United States, 452 F.2d 1110, 1114 (2d Cir. 1971).
 
 
 [63]
 351 U.S. 91 (1956).
 
 
 [64]
 Id. at 95 n.8.
 
 
 [65]
 The predecessor to 8 U.S.C.S 1451(a).
 
 
 [66]
 Zucca, 351 U.S. at 95.
 
 
 [67]
 Id. at 99 (quoting Bindczyck, 342 U.S. at 83-84).
 
 
 [68]
 350 U.S. 179 (1956).
 
 
 [69]
 Id. at 187 (quoting Ng Fung Ho v. White, 259 U.S. 276, 284 (1922)) (internal quotation marks omitted).
 
 
 [70]
 Minker, 350 U.S. at 188.
 
 
 [71]
 Id. (quoting Ng Fung Ho , 259 U.S. at 285) (alteration and omission in original).
 
 
 [72]
 8 U.S.C. SS 1421(a), 1451(a).
 
 
 [73]
 8 U.S.C. S 1451(h).
 
 
 [74]
 8 U.S.C. S 1453.
 
 
 [75]
 El Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473, 487 (1999).
 
 
 
 41
 THOMAS, Circuit Judge, with whom Judges BROWNING, T. G. NELSON, HAWKINS, and TASHIMA join, concurring:
 
 
 42
 I agree that the preliminary injunction should be affirmed. I write separately because I believe that when we review an administrative agency's construction of the statute it administers, the proper analytical framework is dictated by Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984), as recently explained in Food and Drug Administration v. Brown & Williamson Tobacco Corp., _______ U.S. _______, 120 S. Ct. 1291 (2000). Applying that examination to the issues in this case, I conclude that Congress has unambiguously expressed its statutory intent. Therefore, there is no need to determine whether the agency's construction is reasonable.
 
 
 43
 Under Chevron, we must consider first "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. "If Congress has done so, the inquiry is at an end; the court `must give effect to the unambiguously expressed intent of Congress.' " Brown & Williamson, 120 S. Ct. at 1300 (quoting Chevron, 467 U.S. at 843).
 
 
 44
 In making that assessment, we look not only at the precise statutory section in question, but analyze the provision in the context of the governing statute as a whole, presuming congressional intent to create a "symmetrical and coherent regulatory scheme." Id. at 1301 (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 569 (1995)). Finally, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency. " Id. If, after conducting such an analysis, we conclude that Congress has not addressed the issue, we "must respect the agency's construction of the statute so long as it is permissible." Id. at 1300 (citing INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999)). The guidance of Brown & Williamson is especially important in this appeal, because understanding the history of denaturalization procedure is vital to placing the present statute in appropriate context.
 
 
 45
 Until the early 1900s, there was no statutory method of denaturalization. In response to reports of widespread abuse in the naturalization process, President Theodore Roosevelt appointed a commission to investigate the system and make recommendations. See Bindczyck v. Finucane, 342 U.S. 76, 79-80 (1951). Congress responded to the commission's report with the Act of June 29, 1906, 34 Stat. 596 ("1906 Act"). See id. Among the reforms included in the 1906Act was the provision for courts to cancel certificates of naturalization that were fraudulently or illegally procured. See 1906 Act, S 15, 34 Stat. 601. The 1906 Act instituted the judicial denaturalization procedure that remains substantially intact to this day: the appropriate United States Attorney files a civil complaint "upon affidavit showing good cause therefor." See 8 U.S.C. S 1451(b). The usual rules of civil discovery apply and the case is tried before the court sitting in equity. See 7 C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure S 96.11[4][b] (1998).
 
 
 46
 After passage of the 1906 Act, courts apparently entered civil denaturalization judgments with some frequency on a variety of grounds using a relatively low threshold of proof. See id. at S 96.09. However, in 1943, the Supreme Court altered that analysis by holding that citizenship "once conferred should not be taken away without the clearest sort of justification and proof." Schneiderman v. United States, 320 U.S. 118, 122 (1943). Accordingly, the Court imposed a "clear, unequivocal, and convincing" burden of proof on the government in statutory denaturalization cases. Id. at 125 (quoting United States v. Maxwell Land-Grant Co. , 121 U.S. 325, 381 (1887)).
 
 
 47
 Denaturalization through this statutory civil process continued into the early 1950's when the government attempted denaturalization through motions to set aside naturalization orders issued by courts. In Bindczyck, the Supreme Court considered these non-statutory methods of denaturalization. After a thorough review of the legislative history and structure of the statute, the Court concluded that the statutory civil denaturalization proceeding was "the exclusive procedure for canceling citizenship on the score of fraudulent or illegal procurement based on evidence outside the record. " 342 U.S. at 79. Once naturalization was granted, the Court held, it was "proof against attacks for fraud or illegal procurement based on evidence outside the record, except through the proceedings prescribed in S 15." Id. at 84. Thus, the Court held that the non-statutory methods of denaturalization were prohibited by the statute; indeed, the Court concluded that the legislative history "reveals a specific purpose to deprive the naturalizing court as such of power to revoke." Id. at 83.
 
 
 48
 After Bindczyck was decided, Congress amended the section in the Immigration and Nationality Act of 1952, 66 Stat. 8674 163, to protect the power of the courts to modify their own judgments by adding a saving clause, INA S 340(j):
 
 
 49
 Nothing in this section shall be regarded as limiting, denying or restricting the power of any naturaliza tion court, by or in which a person has been natural ized, to correct, reopen, alter, modify, or vacate its judgment or decree naturalizing such person, during the term of such court or within the time prescribed by the rules of procedure or statutes governing the jurisdiction of the court to take such action.
 
 
 50
 66 Stat. 163, 262.
 
 
 51
 This subsection was interpreted by the Supreme Court as abrogating "the specific holding" in Bindczyck that the statutory denaturalization procedure of S 340(a) (the recodification of S 15) "overrode local rules concerning limitations upon the power of state courts to reopen their judgments. " United States v. Zucca, 351 U.S. 91, 95 n.8 (1956). However, as to whether S 340(a) proceedings were "the exclusive method for denaturalization," the Court noted, "[t]he underlying philosophy of Bindczyck remains intact." Id.
 
 
 52
 Thus, between 1952 and 1990, there were two methods for revocation of naturalization orders: (a) the plenaryS 340(a) proceeding; and (b) a motion brought pursuant to the power of courts to reopen and vacate judgments, subject to any generally applicable statutory or procedural limitson that power. The latter mechanism was the one preserved by the 1952 addition of the S 340(j) saving clause.
 
 
 53
 This statutory scheme, and construction, remained intact until the passage of the Immigration Act of 1990 ("1990 Act"). The 1990 Act retained S 340(a), but repealed the saving clause at S 340(j)(redesignated S 340(i) in 1988). No new denaturalization power or procedure was created. Thus, denaturalization procedure reverted to its pre-1952 state. See
 
 
 54
 United States v. Philbrick, 120 U.S. 52, 57-58 (1887). Under pre-1952 law, of course, as construed in Bindczyck and Zucca, the exclusive method of denaturalization was a S 340(a) proceeding.
 
 
 55
 The only new wrinkle, obviously, in the 1990 Act was the insertion of a different saving clause which provided that "[n]othing contained in this section shall be regarded as limiting, denying, or restricting the power of the Attorney General to correct, reopen, alter, modify, or vacate an order naturalizing the person." 8 U.S.C. S 1451(h).
 
 
 56
 As Judge Kleinfeld has demonstrated, the new saving clause must be narrowly construed and interpreted in light of the regulatory scheme established by federal law. See United States v. Locke, 120 S. Ct. 1135, 1146-47 (2000). The 1990 Act does not expressly create any new denaturalization power or procedure, and its structure militates against implying one. The new saving clause was included in a section of the bill labeled "Conforming Amendments" under a subsection "Substituting Appropriate Administrative Authority for Naturalization Court." Congressional designation of an amendment as a "conforming amendment" evidences legislative intent that the amendment should be read as non-substantive. See Springdale Memorial Hosp. Ass'n, Inc. v. Bowen, 818 F.2d 1377, 1386 n.9 (8th Cir. 1987) (citing CBS, Inc. v. FCC, 453 U.S. 367, 381-82 (1981)). Certainly, creating expansive new authority could hardly be characterized as a "conforming " amendment. Cf. United States v. Miguel, 49 F.3d 505, 510 (9th Cir. 1995); United States v. Koyomejian, 970 F.2d 536, 541 (9th Cir. 1992).
 
 
 57
 Implying a new denaturalization power from the saving clause would be also inconsistent with the history and structure of immigration law. Under Bindczyck's construction, unaltered by the 1990 Act, a S 340 proceeding is the "selfcontained, exclusive" method of denaturalization. Because exclusive jurisdiction over a S 340 proceeding is vested in the courts, that power could not have been transferred to the Attorney General by the new saving clause.[1]
 
 
 58
 Finally, the statute separately defines the Attorney General's remedy in the event of illegal or fraudulent procurement to cancellation of the naturalization certificate. See 8 U.S.C. S 1453. However, that section specifically provides that the cancellation affects "only the document and not the citizenship status of the person in whose name the document was issued." Id. In sum, the Attorney General's construction of S 340(h) as conferring new denaturalization power "placed more weight on the saving clauses than those provisions can bear." Locke, 120 S. Ct. at 1146.
 
 
 59
 So what is the effect of the new saving clause? The original saving clause was inserted to protect what Congress perceived as the pre-existing power of courts over their own judgments. Thus, to the extent the new saving clause has any meaning, it must be to preserve the pre-existinggeneral authority of an agency to modify its own issued order. As the panel majority properly noted, "[e]very tribunal, judicial or administrative, has some power to correct its own errors or otherwise appropriately to modify its judgment, decree, or error." Gorbach v. Reno, 179 F.3d 1111, 1120-21 (9th Cir. 1999) (quoting Alberta Gas Chemicals, Ltd. v. Celanese Corp., 650 F.2d 9, 13 (2d Cir. 1981)) (alteration in original). In the administrative context, this right is generally limited to "a short period after the making of the decision and before an appeal has been taken or other rights vested." Aubre v. United States, 40 Fed. Cl. 371, 376 (Fed. Cl. 1998) (quoting Dayley v. United States, 169 Ct. Cl. 305, 308 (1965)). Thus, an agency retains a general authority to modify its decisions for a brief period beginning prior to issuance of the decision, see PLMRS Narrowband Corp. v. F.C.C., 182 F.3d 995, 1001-02 (D.C. Cir. 1999), and ending when the time for judicial review expires, see Pan American Petroleum Corp. v. Federal Power Comm'n., 322 F.2d 999, 1004 (D.C. Cir. 1963).
 
 
 60
 Prior to the time citizenship is conferred,[2] the Attorney General has some limited power to modify or vacate her naturalization decision. See 8 U.S.C. S 1451(h). The INS has the power to correct clerical errors on its own initiative; however, substantive amendments affecting the merits are not authorized. See 8 C.F.R. S 334.5. The INS may reopen an approved application before the oath of allegiance is administered if the INS has received potentially disqualifying information about the applicant. See 8 C.F.R. S 335.5. In such an event, the applicant is given notice and an opportunity to address the concerns. See id. It is these pre-naturalization powers to "correct, reopen, alter, modify, or vacate an order naturalizing the person" and post-naturalization power to correct clerical errors that are "saved" by S 340(h). This construction of the saving clause is consistent with both general administrative law principles and the regulatory scheme created by the 1990 Act.
 
 
 61
 Post-citizenship denaturalization is an entirely different matter. Administrative power to reconsider must be exercised within the authority granted by the governing statute.[3] See Concerned Citizens of Bridesburg v. EPA, 836 F.2d 777, 786 (3d Cir. 1987). Agencies may not "expand their powers of reconsideration without a solid foundation in the language of the statute." Civil Aeronautics Board v. Delta Air Lines, Inc., 367 U.S. 316, 334 (1961). Under the naturalization laws, once citizenship has been granted, it is "proof against attacks for fraud or illegal procurement based on evidence outside the record, except through [a S 340(a) proceeding]." Bindczyck, 342 U.S. at 84. Thus, once the Attorney General has granted citizenship, she has no residual right under the statute to revoke it. Rather, post-naturalization citizenship revocationremedies are limited under the statute to the "exclusive, self-contained" S 340(a) proceeding. The Attorney General simply does not have the authority under the statute to fashion a new post-naturalization revocation remedy out of whole cloth.
 
 
 62
 The text, structure, and history of the 1990 Act and its predecessors clearly demonstrate that a S 340(a) proceeding is the exclusive post-naturalization means of revoking citizenship. Because Congress has directly spoken on this issue, our inquiry under Brown & Williamson is concluded; we need not further examine whether the agency's statutory construction is permissible.
 
 
 63
 For these reasons, I concur in the affirmance of the preliminary injunction.
 
 
 
 Notes:
 
 
 [1]
 In addition, under Schneiderman the "clear, unequivocal, and convincing" burden of proof is on the government in aS 340 proceeding. It would be consistent with the Supreme Court's construction of the statute at hand to interpret the 1990 Act's saving clause as creating a new denaturalization process requiring only "credible and probative" evidence to be tendered. See 8 C.F.R. S 340.1.
 
 
 [2]
 The 1990 Act transferred the power of naturalization from the courts to the Attorney General. See 8 U.S.C. S 1421(a). Under the current procedure, the alien files an application for naturalization with the INS. See 8 U.S.C. S 1445. The INS then conducts an investigation, examines the applicant and decides whether to grant or deny the naturalization application. See 8 U.S.C. S 1446. Before being admitted to citizenship, the applicant must take an oath of allegiance, see 8 U.S.C. S 1448, either before the Attorney General or a court of competent jurisdiction, depending on the circumstances, see 8 U.S.C. S 1421(b). Citizenship is conferred as of the date the oath is taken. See 8 C.F.R. S 338.1(a). After admission to citizenship, a person is entitled to receive from the Attorney General a certificate of naturalization. See 8 U.S.C. S 1449. As previously noted, the Attorney General has the power to cancel the certificate if it has been illegally or fraudulently procured, but such cancellation does not affect citizenship status. See 8 U.S.C. S 1453.
 
 
 [3]
 The panel majority provided a number of examples of agencies who have provided for administrative reopening of decisions under their statutory authority. See Gorbach, 179 F.3d at 1124.