**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SALVADOR MONDACA-VEGA,
*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney
General,
*Respondent.*

No. 03-71369

Agency No.
A019-263-384

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
September 19, 2012—San Francisco, California

Filed April 25, 2013

Before: Harry Pregerson, Susan P. Graber, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Pregerson

## SUMMARY[*]

### Immigration

The panel denied Salvador Mondaca-Vega's petition for review of the district court's findings, following a bench trial pursuant to 8 U.S.C. § 1105a(a)(5) (now 8 U.S.C. § 1252(b)(5)), that he is not a United States citizen.

The panel held that the proper standard of review of the district court's findings of fact on petitioner's nationality claim is for clear error. The panel held that *Lim v. Mitchell*, 431 F.2d 197 (9th Cir. 1970), which would require de novo review, has been effectively overruled because it relied on cases that the Supreme Court subsequently repudiated. The panel also held that the district court correctly placed the burden on petitioner to prove his citizenship by a preponderance of the evidence, and then properly shifted the ultimate burden of proof to the government to prove by clear and convincing evidence that he was removable.

The panel held that the district court's key finding, that petitioner is Salvador Mondaca-Vega, who was born in Mexico and who never became a United States citizen, is not clearly erroneous under the "clear and convincing" standard of proof.

Dissenting, Judge Pregerson would find that petitioner is an American citizen and would grant the petition. Judge Pregerson wrote that the majority erred in holding that

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982) and *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) impliedly overruled the long line of Supreme Court and Ninth Circuit cases holding that this court is required to independently review citizenship cases. Judge Pregerson would find that the government did not meet its burden to prove by clear, unequivocal, and convincing evidence that petitioner is not an American citizen.

## COUNSEL

Martha H. Rickey, Northwest Immigrant Rights Project, Granger, Washington; and Matt Adams, Northwest Immigrant Rights Project, Seattle, Washington, for Petitioner.

Katherine E.M. Goettel, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for Respondent.

## OPINION

GRABER, Circuit Judge:

Who is Petitioner? Is he Reynaldo Carlon Mondaca, a native and citizen of the United States, or is he Salvador Mondaca-Vega, a native and citizen of Mexico? The district court determined that Petitioner is Salvador Mondaca-Vega and, accordingly, that he is not a United States citizen. Reviewing the district court's findings for clear error and finding none, we now deny the petition for review.

## FACTUAL AND PROCEDURAL BACKGROUND

We first reviewed Petitioner's final order of removal in 2003. In considering his claim of citizenship,[1] we noted genuine issues of fact. Therefore, pursuant to 8 U.S.C. § 1105a(a)(5)—which now appears with only minimal modifications at 8 U.S.C. § 1252(b)(5)—we transferred the matter to the United States District Court for the Eastern District of Washington to resolve Petitioner's claim of United States citizenship. *Mondaca-Vega v. Ashcroft*, 104 F. App'x 627 (9th Cir. 2004) (unpublished).

The district court held a bench trial, after which it made extensive findings of fact. As the case reaches us, these relevant underlying facts are undisputed:

On June 3, 1931, Salvador Mondaca-Vega was born to Felix Mondaca and Josefa Vega in Mahone, Mexico. Salvador's birth was registered in El Fuerte, Sinaloa, Mexico, later that month.

On July 17, 1931, Renoldo Mondaca was born to Marin Mondaca and Antonia Carlon in Imperial, California.

Both birth certificates are in evidence, and both are genuine.

No matter where he was born, Petitioner grew up in El Fuerte, Sinaloa, Mexico. He traveled from Mexico to the

---

[1] Petitioner also challenged some of the Board of Immigration Appeal's procedures, but those claims are moot after the district court proceedings on the nationality claim.

United States when he was about 20 years old, or in about 1951.

In 1952, a person claiming to be Salvador Mondaca applied for a Social Security card. The applicant listed Felis Mondaca as his father and Josefa Vega as his mother and gave a birth date of April 13, 1931. His application was rejected because he failed to establish United States citizenship.

On May 11, 1953, a person named Salvador Mondaca-Vega was served with a warrant by the Immigration and Naturalization Service ("INS") while detained in the King County, Washington, jail. On May 19, the person who had been served with the warrant was fingerprinted; the prints are Petitioner's.

On May 22, 1953, Petitioner was deported from the United States under the name Salvador Mondaca-Vega.

On May 23, 1953, someone applied for a Social Security card in Calexico, California, under the name Reynaldo C. Mondaca. Handwriting analysis suggests, but does not firmly establish, that it was Petitioner who signed the application. The Social Security Administration issued a Social Security card to Petitioner under the name Reynaldo C. Mondaca. He has consistently used that Social Security number ever since.

Nonetheless, he continued to use the name Salvador Mondaca-Vega even after receiving the Social Security card in 1953. On September 15, 1954, for example, the INS issued a warrant for the detention of Petitioner, who was being held by the Yakima County, Washington, sheriff, under the name Salvador Mondaca-Vega. While in custody,

Salvador Mondaca-Vega was fingerprinted. The fingerprints taken on that occasion are Petitioner's.

On September 20, 1954, Petitioner gave a sworn, signed statement to an INS official in Seattle. Therein he averred that his name is Salvador Mondaca-Vega, that he was born on "April 16, 1931, at El Puerte [sic], Sin., Mexico," and that he was a citizen of Mexico. He also stated that he had never been lawfully admitted to the United States for any purpose and that he had entered the United States "several times since about 1949." He admitted to having been "apprehended in California a number of times and granted voluntary departures to Mexico." He also agreed that he had been deported once on May 22, 1953. On September 20, 1954, Petitioner was again granted voluntary removal to Mexico under the name Salvador Mondaca-Vega.

In 1959, Petitioner began a relationship with the woman whom he eventually married. They had nine children together, of whom the first six were born in Mexico. The children's baptismal and birth records that are in evidence show the father's name as Reynaldo Mondaca.

On January 11, 1966, Petitioner was deported under yet another name, Jose Valdez-Vega. In 1969, he was referred to on his FBI Rap Sheet as Salvador Vega-Mondaca. At some point, he appears to have stopped using the name Salvador Mondaca-Vega altogether.

In the 1970s, Petitioner obtained certificates of citizenship for four of his children, supported by an affidavit under the name Reynaldo Mondaca. He also filed a relative immigrant visa petition on behalf of his wife and two of his children, again under the name Reynaldo Mondaca. The petition was

approved, and the INS adjusted the status of the wife and one of his children to that of lawful permanent resident.

On April 27, 1998, the Secretary of State issued a United States passport to Petitioner under the name Reynaldo Carlon Mondaca. Petitioner lost the passport and obtained a replacement in 2005; but his passport was revoked in 2011.

Petitioner gave no explanation for why he used the name "Salvador Mondaca-Vega" or why he continued to do so after obtaining a social security card under the name "Reynaldo Mondaca." Nor did he provide any explanation for why he stopped using the name "Salvador Mondaca-Vega" and started using a different name.

After the bench trial, the district court ruled that Petitioner had carried his initial burden of proving citizenship by a preponderance of the evidence, because the INS had determined that his wife and foreign-born children were entitled to derivative adjustment of status and citizenship through him and because the Secretary of State had issued him a passport. Then the court shifted the burden to the government to rebut Petitioner's claim of citizenship by "clear and convincing" evidence that the foregoing determinations of citizenship were a product of fraud or error. The court concluded that the government had carried its heavy burden because, among other reasons, it was "highly probable" that Petitioner's 1954 sworn and signed statement was truthful. Accordingly, the district court ruled that Petitioner is not a United States citizen.

After the district court resolved the citizenship claim, we issued an order to show cause why we "should not adopt the district court's findings and conclusions and deny the petition

for review." *Mondaca-Vega v. Holder*, No. 03-71369 (9th Cir. Aug. 19, 2011) (order). Petitioner timely filed a show-cause brief to challenge the district court's decision.

## STANDARD OF APPELLATE REVIEW

At the outset, the parties dispute the standard of review that we should apply to the district court's findings of fact. Classic findings of fact lie at the heart of this case: Where was Petitioner born? Which birth certificate is his? Is his testimony credible? A legal consequence—United States citizenship—depends on the answer to those questions, but the law is not in doubt; only the facts are.

The government contends that Federal Rule of Civil Procedure 52(a)(6) prohibits us from setting aside a district court's finding of fact unless it is clearly erroneous. Petitioner counters that we should, instead, follow *Lim v. Mitchell*, 431 F.2d 197 (9th Cir. 1970), and review de novo the factual findings relating to his citizenship claim. Interpretation of the Federal Rules of Civil Procedure is a question of law, *Jenkins v. Whittaker Corp.*, 785 F.2d 720, 736 (9th Cir. 1986), with respect to which we must follow circuit precedent unless it is inconsistent with intervening decisions of the Supreme Court or of this court sitting en banc, *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). For the reasons that we will explain, *Lim* no longer is good law, and we must review the district court's findings of fact for clear error.

*Lim* involved an application for a certificate of citizenship. We wrote that, in such a case, we "must make an independent determination as to whether the evidence introduced by" the government sufficed to satisfy its burden

of proof, and we undertook to "re-examine the facts." *Lim*, 431 F.2d 199, 200 n.4; *see also United States v. Delmendo*, 503 F.2d 98, 100 n.2 (9th Cir. 1974) ("In reviewing denaturalization based on claims that naturalization was illegally or fraudulently obtained, we are not bound by the district court's findings even if they are not clearly erroneous." (citing *Bechtel v. United States*, 176 F.2d 741, 744 (9th Cir. 1949)).

Both *Lim* and *Bechtel* relied on *Knauer v. United States*, 328 U.S. 654 (1946). There, the Supreme Court had held, in the context of a denaturalization proceeding, that the reviewing court "reexamine[s] the facts to determine whether the United States has carried its burden of proving . . . that the citizen who is sought to be restored to the status of an alien obtained his naturalization certificate illegally." *Id.* at 657–58. *Knauer*, in turn, relied on *Baumgartner v. United States*, 322 U.S. 665 (1944). In that case, the Court had held that, because "[f]inding so-called ultimate 'facts' more clearly implies the application of standards of law[,] . . . the conclusion that may appropriately be drawn from the whole mass of evidence is not always the ascertainment of the kind of 'fact' that precludes consideration by this Court." *Id.* at 671.[2] The Supreme Court has since cabined much of the core of *Baumgartner*:

---

[2] *Knauer* and *Baumgartner* are the first in a line of cases extending through *Fedorenko v. United States*, 449 U.S. 490, 506 (1981) ("[I]n reviewing denaturalization cases, we have carefully examined the record ourselves." (citing *Costello v. United States*, 365 U.S. 265, 269–70 (1961); *Chaunt v. United States*, 364 U.S. 350, 353 (1960); *Nowak v. United States*, 356 U.S. 660, 663 (1958))).

[T]his Court has on occasion itself indicated that findings on "ultimate facts" are independently reviewable. In *Baumgartner v. United States*, 322 U.S. 665 (1944), the issue was whether or not the findings of the two lower courts satisfied the clear-and-convincing standard of proof necessary to sustain a denaturalization decree. The Court held that the conclusion of the two lower courts that the exacting standard of proof had been satisfied was not an unreviewable finding of fact but one that a reviewing court could independently assess. The Court referred to the finding as one of "ultimate" fact, which in that case involved an appraisal of the strength of the entire body of evidence. The Court said that the significance of the clear-and-convincing proof standard "would be lost" if the ascertainment by the lower courts whether that exacting standard of proof had been satisfied on the whole record were to be deemed a "fact" of the same order as all other "facts not open to review here." *Id.* at 671.

. . . .

Whatever *Baumgartner* may have meant by its discussion of "ultimate facts," *it surely did not mean that whenever the result in a case turns on a factual finding, an appellate court need not remain within the constraints of Rule 52(a).* *Baumgartner*'s discussion of "ultimate facts" referred not to pure findings

of fact—as we find discriminatory intent to be in this context—but to findings that "clearly [imply] the application of standards of law." [*Id.*]

*Pullman-Standard v. Swint*, 456 U.S. 273, 286 n.16 (1982) (emphasis added) (alteration in original).

And the Supreme Court has rejected *Baumgartner*'s remaining reasoning. *Baumgartner* stated:

> [A] "finding of fact" may be the ultimate judgment on a mass of details involving *not merely an assessment of the trustworthiness of witnesses* but other appropriate inferences that may be drawn from living testimony which elude print. The conclusiveness of a "finding of fact" depends on the nature of the materials on which the finding is based.

322 U.S. at 670–71 (emphasis added). But in *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985), the Court held that the clearly erroneous standard applies

> even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts. To be sure, various Courts of Appeals have on occasion asserted the theory that an appellate court may exercise *de novo* review over findings not based on credibility determinations. This theory has an impressive genealogy, having first been articulated in an

> opinion written by Judge Frank and subscribed to by Judge Augustus Hand, but it is impossible to trace the theory's lineage back to the text of Rule 52(a), which states straightforwardly that "findings of fact shall not be set aside unless clearly erroneous." That the Rule goes on to emphasize the special deference to be paid credibility determinations does not alter its clear command: Rule 52(a) "does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous."

*Id.* at 574 (citations omitted) (quoting *Pullman-Standard*, 456 U.S. at 287).

The dissent correctly notes that an echo of *Baumgartner*'s reasoning can be heard in the Supreme Court's decisions regarding review of facts in the First Amendment context. In *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 514 (1984), the Supreme Court held that "the clearly-erroneous standard of [Rule 52(a)] does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a case governed by [*New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964)]." Even there, though, the court limited its exception to Rule 52(a)'s general standard to the unique, substantive principle of First Amendment law that was at issue in that case. *See Bose Corp.*, 466 U.S. at 514 n.31 (noting that there are "many findings of fact in a defamation case that are irrelevant to the constitutional standard . . . to which the clearly-erroneous

standard of Rule 52(a) is fully applicable"). The Supreme Court has given us no reason to extend *Bose Corp.*'s narrow holding to this unrelated context.

In short, *Lim* and its progeny relied on implications drawn from *Knauer* and *Baumgartner* that the Supreme Court subsequently repudiated in *Pullman-Standard* and *Anderson*. Because *Lim* is clearly irreconcilable with *Pullman-Standard* and *Anderson*, it has been effectively overruled. *See Miller*, 335 F.3d at 900 ("[I]ssues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable. . . . In future cases of such clear irreconcilability, a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled.").

Having concluded that *Lim* does not compel de novo review, we next must decide what standard does apply. The district court held a bench trial pursuant to 8 U.S.C. § 1252(b)(5)(B), which provides for trial of a nationality claim by the district court, "as if an action had been brought in the district court under [the Declaratory Judgment Act]." Rule 52(a) unambiguously requires that, in an action thus tried by the court instead of a jury, the court "find the facts specially" and that, on review, those factual findings be set aside only if "clearly erroneous." Fed. R. Civ. P. 52(a)(1), (6). The Supreme Court's decisions in *Pullman-Standard* and *Anderson* make clear that there is no exception to that rule merely because the facts found are determinative of Petitioner's ultimate claim. Nor have we found any other applicable exception to Rule 52(a)'s general requirement that

we review a court's findings of fact in a civil case for clear error.  Accordingly, review for clear error is required.  *See, e.g.*, *Republic W. Ins. Co. v. Spierer, Woodward, Willens, Denis & Furstman*, 68 F.3d 347, 350 (9th Cir. 1995) (applying "clearly erroneous" standard to review of district court's factual findings in declaratory judgment action).[3]

Before reviewing the district court's findings of fact under this standard, though, we consider another preliminary issue: whether the district court applied the correct burden of proof.

## DISTRICT COURT'S ALLOCATION OF THE BURDEN OF PROOF[4]

Both Petitioner and the government contend that the district court erred with respect to the parties' burdens of proof.  In *Ayala-Villanueva v. Holder*, 572 F.3d 736 (9th Cir. 2009), we set forth a burden-shifting framework for removal proceedings:

---

[3] We acknowledge that the First Circuit, in *United States v. Zajanckauskas*, 441 F.3d 32, 37–38 (1st Cir. 2006), held that clear-error review does not apply to a district court's factual findings in a denaturalization proceeding.  For the reasons explained in text, we find our sister court's reasoning unpersuasive.

[4] "The selection of the appropriate burden of proof is a question of law reviewed de novo." *Taisho Marine & Fire Ins. Co. v. M/V Sea-Land Endurance*, 815 F.2d 1270, 1274 (9th Cir. 1987).  De novo review applies not only to the assignment or allocation of the burden, *Molski v. Foley Estates Vineyard & Winery, LLC*, 531 F.3d 1043, 1046, 1048 (9th Cir. 2008), but also to the quantum of proof required, *United States v. Gill*, 280 F.3d 923, 929–31 (9th Cir. 2002).

> [T]he DHS [Department of Homeland Security] bears the burden of establishing by clear, unequivocal, and convincing evidence, all facts supporting deportability. Evidence of foreign birth gives rise to a rebuttable presumption of alienage, shifting the burden to the alleged citizen to prove citizenship. Upon his production of substantial credible evidence in support of his citizenship claim, the presumption of alienage is rebutted. The DHS then bears the ultimate burden of proving the respondent removable by clear and convincing evidence.

*Id.* at 737 n.3 (citations omitted).

The government first argues that the district court failed to place the burden on Petitioner to prove his citizenship by a preponderance of the evidence before shifting the burden of proof to the government. We are not persuaded that the district court erred.

The court properly looked first to Petitioner's evidence of citizenship. In addition to introducing a passport, Petitioner produced a genuine United States birth certificate and presented corroborating testimony from family members to support his averment that he is the person identified on that birth certificate. That information constituted "substantial credible evidence in support of [Petitioner's] citizenship claim" and was therefore sufficient under *Ayala-Villanueva*. *Id.* Any presumption of alienage was thereby rebutted, and the government then bore the "ultimate burden" of proving that Petitioner was removable. *Id.*

Next, Petitioner contends that the district court erred in requiring the government to prove alienage only by "clear and convincing" evidence instead of "clear, *unequivocal*, and convincing" evidence. (Emphasis added.) According to Petitioner, the term "unequivocal" raises the government's burden to something higher than the clear-and-convincing standard—perhaps equal to or even higher than the level of proof "beyond a reasonable doubt" that is required to support a criminal conviction. We reject Petitioner's argument and hold that the two formulations of the government's burden of proof in removal proceedings are indistinguishable.

It is true, as Petitioner points out, that in at least two cases we have articulated the government's burden for disproving citizenship as "clear, unequivocal, and convincing" evidence, without expressly equating that formulation to the more common "clear and convincing" standard. *Lim*, 431 F.2d at 199; *Lee Hon Lung v. Dulles*, 261 F.2d 719, 723–24 (9th Cir. 1958) (equating the stated standard of proof with the "rule which obtains in denaturalization cases" (citing *Schneiderman v. United States*, 320 U.S. 118, 123, 125 (1943))). In many cases, though, we have used the two phrases interchangeably to describe a single standard. *See, e.g.*, *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) (using the two formulations interchangeably); *Ayala-Villanueva*, 572 F.3d at 737 n.3 (same); *Lopez-Chavez v. INS*, 259 F.3d 1176, 1180–81 (9th Cir. 2001) (same); *Friend v. Reno*, 172 F.3d 638, 646 (9th Cir. 1999) (describing *Schneiderman* as setting forth a "clear and convincing" standard); *Murphy v. INS*, 54 F.3d 605, 608–10 (9th Cir. 1995) (using the two formulations interchangeably and explaining the standard by quoting Modern Federal Jury Instructions, Model Civil Jury Instructions for the Ninth Circuit § 5.02, 9-27 (Ninth Circuit Jury Committee 1993)).

Indeed, we have found no post-*Anderson* case in which we differentiated "clear and convincing" from "clear, unequivocal, and convincing."

Petitioner contends that the Supreme Court differentiated the two standards in *Addington v. Texas*, 441 U.S. 418, 432 (1979), and that the term "unequivocal" heightens the burden of proof. We do not read *Addington* to require the government to meet a unique burden of proof in citizenship matters.

In *Addington*, the Court considered the standard of proof required under the Due Process Clause of the Fourteenth Amendment to support an individual's involuntary and indefinite civil commitment for mental illness. *Id.* at 419–20. The trial court had instructed the jury to complete a verdict form that asked whether "clear, unequivocal and convincing evidence" supported the commitment. *Id.* at 421. The Supreme Court held that due process required "clear and convincing" evidence in civil commitment proceedings and that the trial court's "clear, unequivocal, and convincing" satisfied that minimum. *Id.* at 433. The Court did not decide whether the word "unequivocal" necessarily set the standard higher than the constitutional requirement. Rather, it remanded the case to allow the state courts to determine whether, as a matter of state law, the two formulations were equivalent. *Id.*

In reaching its result, the *Addington* opinion suggested that, whatever Texas state law might require, federal law generally recognizes a "continuum" containing only "three standards or levels of proof." *Id.* Specifically, it identified the "mere preponderance of the evidence" standard; the "beyond a reasonable doubt" standard; and an "*intermediate*

*standard*, which usually employs *some combination of the words 'clear,' 'cogent,' 'unequivocal,' and 'convincing.'*" *Id.* at 423–24 (emphases added). As one example of a case in which the intermediate standard applies, *Addington* cited *Schneiderman*, the denaturalization case. *Id.* at 432. Thus, the *Addington* decision expressly recognized that, in citizenship cases, the necessary level of proof reflects the general *intermediate* standard—one that certainly falls below the "beyond a reasonable doubt" standard of proof applied in criminal prosecutions. Moreover, the Court, by resting its reasoning on the premise that *three* standards are generally recognized, implicitly precluded Petitioner's argument that a semantic variation in how the intermediate standard is articulated changes its substantive requirements.

Two years later, in *California ex rel. Cooper v. Mitchell Bros.' Santa Ana Theater*, 454 U.S. 90, 93 (1981) (per curiam), the Supreme Court again observed that "[t]hree standards of proof are generally recognized" under federal law. With respect to the intermediate standard, "[t]he precise verbal formulation . . . varies, and phrases such as 'clear and convincing,' 'clear, cogent, and convincing,' and 'clear, unequivocal, and convincing' have all been used." *Id.* at 93 n.6. As in *Addington*, the Court declined to recognize any distinction among the various formulations of the intermediate standard.

Indeed, the Supreme Court itself has used the phrases "clear, unequivocal, and convincing" and "clear and convincing" interchangeably. In *Baumgartner*, the Court emphasized "the importance of *clear, unequivocal, and convincing* proof" to permit denaturalization. 322 U.S. at 671 (emphasis added) (internal quotation marks omitted). Yet in *Anderson*, the Court characterized *Baumgartner* as presenting

the issue "whether or not the findings of the two lower courts satisfied the *clear-and-convincing standard of proof* necessary to sustain a denaturalization decree." 456 U.S. at 286 n.16 (emphasis added).

For those reasons, we hold that the two formulations of the government's burden in removal proceedings that have appeared in our cases both require the same intermediate quantum of proof.[5] In sum, then, the district court did not err in shifting the burden of proof to the government, nor did it err in selecting the "clear and convincing" formulation when assigning the level of proof that the government had to meet.

## DISTRICT COURT'S FINDINGS OF FACT

Finally, we turn to Petitioner's claim that the district court erred in finding that he is Salvador Mondaca-Vega, a native and citizen of Mexico. As we have held, we review the court's factual findings for clear error.

> [A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . If the district court's account of the evidence is plausible in light of the record viewed in its

---

[5] The parties do not dispute what constitutes "clear and convincing" evidence, if that standard applies. Generally, "clear and convincing" evidence requires more than a mere preponderance of the evidence. It consists of evidence that "indicat[es] that the thing to be proved is highly probable or reasonably certain." *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001) (alteration in original) (quoting *Black's Law Dictionary* 577 (7th ed. 1999)).

> entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson*, 470 U.S. at 573–74 (internal quotation marks omitted); *see also United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc) ("[T]he scope of our review limits us to determining whether the trial court reached a decision that falls within any of the permissible choices the court could have made. In other words, the Supreme Court's precedent convinces us that any 'definite and firm conviction' of the reviewing court must still include some measure of deference to the trial court's factual determinations."). Credibility findings demand even greater deference. *Anderson*, 470 U.S. at 575; *see also Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002). When applying this standard of review, we necessarily incorporate an understanding of the appropriate burden of proof in the district court. *See Marsellus v. Comm'r*, 544 F.2d 883, 885 (5th Cir. 1977) (holding that a finding of fraud may be reversed only for clear error, but that the finding must be judged in view of the "clear and convincing" burden of proof); *see also MacDonald v. Kahikolu, Ltd.*, 581 F.3d 970, 976 (9th Cir. 2009) (reviewing for clear error the district court's finding that the evidence clearly and convincingly established a fact); *EEOC v. Maricopa Cnty. Cmty. Coll. Dist.*, 736 F.2d 510, 513 (9th Cir. 1984) (reviewing for clear error the district court's factual conclusion that a party had sustained its burden of proving that a statutory provision applied).

That said, some of the challenged findings are not findings at all. For example, the district court opined that the most probable reason for Petitioner's transition from using the name Salvador Mondaca-Vega to using the name Reynaldo Carlon Mondaca was his marriage, and his desire to obtain benefits that could flow to him and his family from using the name of a United States citizen. This observation is not so much a finding as it is a part of the court's reasoning when deciding that Petitioner was not a credible witness. Nor was this observation a necessary, or even a particularly important, reason why the court disbelieved Petitioner. Petitioner does not challenge the accuracy of the other reasons that the district court gave: that Petitioner routinely used the name Salvador Mondaca-Vega throughout the 1950s and 1960s, that he began to use the name Reynaldo C. Mondaca later, that he offered no explanation whatsoever for why he stopped using one name and started using the other, and that his testimony in court was inconsistent with his earlier testimony before an immigration judge.[6]

Some of the dispute centers on how the district court chose to weigh evidence, and on which evidence it chose to address explicitly in its decision. These arguments essentially recapitulate Petitioner's request for us to reweigh the evidence anew, which we may not do.

Some of the challenged findings are not clearly erroneous. We will discuss four examples.

1. The district court found that Petitioner accepted voluntary departure "ten to twenty times" under the name

---

[6] The same reasoning obtains with respect to the district court's conjecture as to the reasons why Petitioner took various other actions.

Salvador Mondaca-Vega. In support, the court cited the parties' agreed fact: "At his 1998 immigration court hearing, Petitioner stated that he accepted voluntary departure ten to twenty times."

Petitioner disputes the finding that linked all the departures to the name Salvador Mondaca-Vega because he accepted voluntary departure under a different name, "Jose Vega-Valdez," at least once. We are not persuaded.

Petitioner admitted that he had accepted voluntary departure "ten to twenty times" and that he went by Salvador Mondaca-Vega during the relevant time period. Moreover, Petitioner's fingerprints are associated with FBI records that document his deportation or voluntary departure on at least five separate occasions, four of which occurred under the name Salvador Mondaca-Vega. Notwithstanding a single aberration—the admitted use of an alias for one voluntary departure—the district court reasonably inferred that Petitioner did accept voluntary departure ten to twenty times under the name Salvador Mondaca-Vega. *See United States v. Bucher*, 375 F.3d 929, 931 (9th Cir. 2004) ("[F]acts *and* reasonable inferences from those facts are the province of the trier of fact."). We see no clear error.

2. Likewise, the district court did not clearly err in finding that Petitioner was deported in July 1953 under the name Salvador Mondaca-Vega. Petitioner unquestionably was detained in July 1953. It was reasonable for the court to infer that he also was deported then, in view of his admission that he was removed on several occasions under that name.

3. Similarly, we see no clear error in the district court's adverse credibility finding with respect to Petitioner's wife.

She was unable to testify in the district court because she died before trial. For that reason, the district court relied on her 1994 sworn statement and the transcript of her 1998 testimony before the immigration judge. The district court's adverse credibility determination rested on, among other things, inconsistencies in her initial sworn statement, which twice stated that Petitioner was born in Mexico, and a lack of intimate details in that testimony. Those grounds, which the record bears out, suffice to support the adverse credibility determination under the deferential standard of review enunciated in Rule 52(a)(6).

It is well settled that a fact-finder may rely on inconsistencies to support an adverse credibility determination. *See, e.g.*, *Berry v. Astrue*, 622 F.3d 1228, 1235 (9th Cir. 2010) (holding that "inconsistencies . . . adequately support the [administrative law judge's ("ALJ")] adverse credibility finding"); *see also United States v. McCarty*, 648 F.3d 820, 829 (9th Cir. 2011) (observing that the district court "based its credibility determination on inconsistencies in [a witness'] testimony"). Here, the trial court identified inconsistencies that were particularly significant because they involved the very fact at issue—the place of Petitioner's birth.

In addition, trial courts are generally permitted to evaluate credibility of testimony by assessing its level of detail. *See Shrestha v. Holder*, 590 F.3d 1034, 1040 (9th Cir. 2010) (holding that the level of detail in testimony is a "relevant factor" in the "totality of the circumstances" test of credibility employed by immigration judges); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (allowing an ALJ to employ "ordinary techniques of credibility evaluation," which include discrediting "vague" testimony); *Sparkman v.*

*Comm'r*, 509 F.3d 1149, 1156 (9th Cir. 2007) ("The Tax Court, describing [a witness'] testimony as 'vague, contrived, and non-credible,' plainly did not believe her, and the Tax Court, like any other court, may disregard uncontradicted testimony by a taxpayer where it finds that testimony lacking in credibility." (some internal quotation marks omitted)).

4. The court permissibly took judicial notice of distances between geographical points. A "court may take judicial notice of undisputed geographical facts." *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1358 n.4 (9th Cir. 1998).

Nevertheless, Petitioner correctly identifies a few findings that are clearly erroneous: that Petitioner was deported in July 1951, September 1951, and November 1952 (the government concedes error as to these specific dates); and that in 1953 one had to present a birth certificate in order to obtain a Social Security card (as to which there is no evidence in the record, and no document of which the court could take judicial notice).[7]

The crucial question then becomes whether the essential findings—that Petitioner is Salvador Mondaca-Vega, who was born in Mexico and who never became a United States citizen—are clearly erroneous when those erroneous findings are taken out of the mix. We easily conclude that, taken in the context of the entire record and the findings as a whole, the errors pertain to inconsequential points. *See Societe Generale de Banque v. Touche Ross & Co. (In re U.S. Fin.*

---

[7] A judge may not take judicial notice in reliance on personal experience. *United States v. Berber-Tinoco*, 510 F.3d 1083, 1091 (9th Cir. 2007). That is what occurred here.

*Sec. Litig.*), 729 F.2d 628, 630 (9th Cir. 1984) (noting that we may affirm in reliance on any evidence in the record that supports the trial court's judgment). In view of the many undisputed facts and the additional non-erroneous subordinate findings, we hold that the district court's key finding, that Petitioner is Salvador Mondaca-Vega, is not clearly erroneous under the "clear and convincing" standard of proof.

Petition **DENIED**.

---

PREGERSON, Circuit Judge, dissenting:

The Supreme Court has long held that when the priceless right of United States citizenship is at stake, the government must prove its case by clear, unequivocal, and convincing evidence. Integral to the government's heavy burden of proof, the Supreme Court established that we are required to independently review such cases and must scrutinize the record ourselves in order to safeguard the right of citizenship. Our precedents have faithfully and consistently followed the Supreme Court's instructions.

On dubious grounds, the majority declares that in *Pullman-Standard v. Swint*, 456 U.S. 273 (1982) and *Anderson v. City of Bessemer City*, *N.C.*, 470 U.S. 564 (1985), the Supreme Court impliedly overruled the long line of Supreme Court and Ninth Circuit cases holding that we are required to independently review citizenship cases. *See Fedorenko v. United States*, 449 U.S. 490 (1981); *Costello v. United States*, 365 U.S. 265 (1961); *Chaunt v. United States*, 364 U.S. 350 (1960); *Nowak v. United States*, 356 U.S. 660 (1958); *Knauer v. United States*, 328 U.S. 654 (1946);

*Baumgartner v. United States*, 322 U.S. 665 (1944); *United States v. Delmendo*, 503 F.2d 98 (9th Cir. 1974); *Lim v. Mitchell*, 431 F.2d 197 (9th Cir. 1970); *Stacher v. United States*, 258 F.2d 112 (9th Cir. 1958).

The majority concludes that when the government seeks to revoke citizenship or to deport a petitioner who claims to be a citizen, Federal Rules of Civil Procedure Rule 52(a)'s clear error standard of review applies. I disagree. Independent review is required. Here, the government has not met its burden to prove by clear, unequivocal, and convincing evidence that Petitioner is not an American citizen.

## I.  THE RIGHT OF CITIZENSHIP

"Citizenship in the United States of America is among our most valuable rights." *Gorbach v. Reno*, 219 F.3d 1087, 1098 (9th Cir. 2000) (en banc). It is the right that "protects our life, liberty, and property from arbitrary deprivation." *Id.* What is more, all of the opportunities we seek to pass onto our children, "depend on [our children's] secure rights to stay in this country and enjoy its guarantees of life, liberty, and property, and the domestic peace and prosperity that flow from those guarantees." *Id.* at 1099.

"[T]o deprive a person of his [or her] American citizenship is an extraordinarily severe penalty." *Klapprott v. United States*, 335 U.S. 601, 612 (1949). "To deport one who so claims to be a citizen obviously deprives him of liberty," and "[i]t may result also in loss of both property and life, or of all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). Proceedings determining the loss of citizenship place "the fate of a human being . . . at

stake." *Knauer v. United States*, 328 U.S. 654, 659 (1946) (comparing denaturalization to deportation).

## II.  THE GOVERNMENT'S BURDEN OF PROOF

I believe that the majority gives short shrift to the policies that underlay the government's burden of proof and the Supreme Court's formulation of that burden for citizenship cases.  Because of "grave consequences to the citizen," to revoke his or her citizenship "the evidence must indeed be 'clear, unequivocal, and convincing' and not leave 'the issue in doubt.'"  *Chaunt v. United States*, 364 U.S. 350, 353 (1960) (quoting *Schneiderman v. United States*, 320 U.S. 118, 125, 158 (1943)).  This is a "heavy" burden of proof. *Fedorenko v. United States*, 449 U.S. 490, 505 (1981).[1]

The government's burden of proof in deportation proceedings is identical to the burden of proof in denaturalization proceedings.  This is so because the Supreme Court has analogized deportation to denaturalization and concluded that "[n]o less a burden of proof is appropriate in deportation proceedings."  *Woodby v. INS*, 385 U.S. 276, 285–86 (1966) (finding "many resident aliens have lived in this country longer and established stronger family, social, and economic ties here than some who have become

---

[1] Our citizenship cases have consistently described the "clear, unequivocal, and convincing" burden of proof in accordance with the Supreme Court's characterization as a heavy burden which does not leave the issue in doubt.  *See, e.g.*, *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) (citizenship case stating that the "clear, unequivocal, and convincing" burden of proof is a "heavy burden"; the government's evidence "must not leave the issue in doubt" (internal quotations and citations omitted)); *United States v. Dang*, 488 F.3d 1135, 1139 (9th Cir. 2007) (same); *Lim v. Mitchell*, 431 F.2d 197, 199 (9th Cir. 1970) (same).

naturalized citizens"); *Alocozy v. USCIS*, 704 F.3d 795, 799 (9th Cir. 2012). In deportation proceedings concerning a petitioner's claim of United States citizenship, the government bears the "ultimate burden" of establishing foreign birth by "clear, unequivocal, and convincing evidence."[2] *Chau v. INS*, 247 F.3d 1026, 1029 n.5 (9th Cir. 2001); *Ayala-Villanueva v. Holder*, 572 F.3d 736 (9th Cir. 2009).

The Supreme Court has emphasized that the high burden of proof in citizenship cases acknowledges that "[n]ew relations and new interests flow, once citizenship has been granted." *Baumgartner v. United States*, 322 U.S. 665, 675 (1944). In *Baumgartner*, the Supreme Court rejected the government's attempt to "make[] an alien out of a man ten years after he was admitted to citizenship." *Id.* at 677. In this case, the government seeks to revoke citizenship claimed by an eighty-one year old man who contends he was born an American citizen and whose children all derived citizenship or legal permanent resident status through him over thirty-five years ago. The "[s]evere consequences" arising from the loss of citizenship may be "aggravated when the person has enjoyed his citizenship for many years." *Costello v. United States*, 365 U.S. 265, 269 (1961). All the blessings of United States citizenship "should not be undone unless the proof is

---

[2] In 1961, Congress enacted 8 U.S.C. § 1105a(a)(5), which now appears with minimal modification at 8 U.S.C. § 1252(b)(5), that codified judicial review of deportation orders "in which the person subject to deportation claims to be a United States citizen." *Agosto v. INS*, 436 U.S. 748, 752–53 (1978). "In carving out this class of cases, Congress was aware of [the Supreme Court's] past decisions holding that the Constitution requires that there be some provision for *de novo* judicial determination of claims to American citizenship in deportation proceedings." *Id.* at 753; *see, e.g.*, *Ng Fung Ho*, 259 U.S. at 285.

compelling that [citizenship] which was granted was [not properly] obtained." *Baumgartner*, 322 U.S. at 675.

## III. STANDARD OF APPELLATE REVIEW

### A. The Crucial Role of Independent Review in Citizenship Cases

The majority fails to recognize that our exercise of independent review in citizenship cases plays a crucial role in assuring that the government's heavy burden of proof has been met. In *Baumgartner*, the Supreme Court instructed that the government's heavy burden to revoke citizenship "would be lost" if the lower courts' determination "whether that exacting standard of proof had been satisfied" was not open to independent review by the appellate court. *Baumgartner*, 322 U.S. at 671 (internal citation omitted). Consequently, the appellate court must make its own determination whether "the evidence . . . measure[s] up to the standard of proof which must be applied to [a denaturalization] case." *Id.* at 672. *Baumgartner* explained that this standard of appellate review "is usually differentiated from review of ordinary questions of fact by being called review of a question of law." *Id.* at 671.

Independent appellate review is justified, much like the government's heavy burden of proof, in light of the valuable rights at stake. *See* Edward H. Cooper, *Civil Rule 52(a): Rationing and Rationalizing the Resources of Appellate Review*, 63 Notre Dame L. Rev. 645, 668 (1988) ("The sweeping review practiced in *Baumgartner* was explained in part on the basis of the same policies as require clear proof. . . . [T]he Court was surely right to take a close look."). The Supreme Court has emphasized that because "[t]he issue

in [denaturalization] cases is so important to the liberty of the citizen[,] the weight normally given concurrent findings of two lower courts does not preclude reconsideration here." *Chaunt v. United States*, 364 U.S. 350, 353 (1960). "For denaturalization, like deportation, may result in the loss 'of all that makes life worth living.'" *Knauer*, 328 U.S. at 659 (quoting *Ng Fung Ho*, 259 U.S. at 284). If the law were otherwise, "valuable rights" would be vulnerable to "the political temper of majority thought and the stresses of the times." *Id.* at 658–59 (internal quotations and citation omitted).

Since *Baumgartner*, an unbroken line of Supreme Court cases has held that when citizenship is at stake, the appellate court makes an independent review of the record to determine whether the government met its heavy burden to present clear, unequivocal, and convincing evidence to prove its case. *See*, *e.g.*, *Fedorenko*, 449 U.S. at 506 (explaining "in reviewing denaturalization cases, we have carefully examined the record ourselves" (citations omitted)); *Costello v. United States*, 365 U.S. 265, 272 (1961) ("examin[ing] the record to determine if the evidence leaves 'the issue in doubt'"); *Chaunt*, 364 U.S. at 353 (stating reconsideration is appropriate given the rights at stake); *Nowak v. United States*, 356 U.S. 660, 661-62 (1958) (explaining "[w]here citizenship is at stake the Government carries [a] heavy burden" and "it becomes our duty to scrutinize the record with the utmost care"); *Knauer*, 328 U.S. at 657 ("We reexamine the facts to determine whether the United States has carried its burden of proving [denaturalization] by 'clear, unequivocal, and convincing' evidence, which does not leave 'the issue [of citizenship] in doubt. . . .'" (citation omitted)).

Our circuit precedent accordingly holds that when citizenship is at stake, "[we] must make an independent determination as to whether the evidence introduced by the [government] was 'clear, unequivocal, and convincing.'" *Lim*, 431 F.2d at 199 (citation omitted). In *Lim v. Mitchell*, we reviewed an action initiated by petitioner Lim against the Attorney General of the United States for a judgment declaring Lim to be a citizen of the United States. *Id.* at 198–99. We did not hesitate to apply the independent appellate review that had been established in denaturalization precedents because the denial of Lim's claim to citizenship was "in its consequences 'more serious than a taking of one's property, or the imposition of a fine or other penalty.'" *Id.* at 199 (quoting *Schneiderman*, 320 U.S. at 122).[3] In our view, a judgment declaring a petitioner to be a non-citizen has the same "practical effect . . . [as] a decision favorable to the Government in a denaturalization case" because "the individual is stripped of . . . the 'priceless benefits' which derive from the status of citizenship." *Lee Hon Lung v. Dulles*, 261 F.2d 719, 720, 724 (9th Cir. 1958) (quoting *Schneiderman*, 320 U.S. at 122).[4] Thus, under *Lim*, a

---

[3] A person "may pursue a citizenship claim in two ways." *Lopez v. Holder*, 563 F.3d 107, 110 (9th Cir. 2009) (internal quotations and citation omitted). A person may: (1) "assert citizenship as a defense to a removal proceeding," if unsuccessful, and after exhausting administrative remedies, he may petition for a judicial declaration of citizenship under 8 U.S.C. § 1252(b); or (2) "seek proof of citizenship by filing an application for citizenship under 8 U.S.C. § 1452(a)," if it is denied, and after exhausting administrative remedies, he may petition for a judicial declaration of citizenship under 8 U.S.C. § 1503. *Id.* This case concerns the former, *Lim* concerned the latter.

[4] In one exception, we applied Rule 52(a) instead of independent review under *Lim* in reviewing a petition under 8 U.S.C. § 1105a(a)(5) on the grounds that there "ha[d] been no prior determination of citizenship" upon

judgment declaring a petitioner to be a non-citizen, as we have here, is subject to independent review.[5]

Of course, we have likewise held that "[i]n reviewing denaturalization . . . , we are not bound by the district court's findings even if they are not clearly erroneous." *United States v. Delmendo*, 503 F.2d 98, 100 n.2. (9th Cir. 1974) (citation omitted). Instead, "[w]e must come to our own conclusion as to the facts." *Stacher v. United States*, 258 F.2d 112, 120 (9th Cir. 1958).

---

which "both the petitioner and the government had relied for many years." *Sanchez-Martinez v. INS*, 714 F.2d 72, 73-74 (9th Cir. 1983). That exception is not applicable here because the government made prior determinations of citizenship through granting Petitioner's family derivative citizenship based on Petitioner's citizenship and by also issuing Petitioner a passport. *See* 22 U.S.C. § 2705 (stating a valid passport "shall have the same force and effect as proof of United States citizenship as certificates of naturalization or of citizenship"); *Lim*, 431 F.2d at 198 (noting government had issued petitioner a passport as a citizen and petitioner's wife and daughter had obtained derivative citizenship through petitioner).

[5] In denaturalization cases, the consequence is the revocation of citizenship. In deportation cases such as this, the consequence of erroneously deporting a petitioner—is the exile of an American citizen. It is inconceivable that the potential exile of an American citizen is any less deserving of independent review. *Cf. Kwock Jan Fat v. White*, 253 U.S. 454, 464 (1920) ("It is better that many . . . immigrants should be improperly admitted than that one natural born citizen of the United States should be permanently excluded from his country."). In fact, the Supreme Court has found that the "immediate hardship of deportation is often greater than that inflicted by denaturalization" when the deportee is an alien, let alone a deportee claiming to be an American citizen. *See Woodby*, 385 U.S. at 286.

**B.** ***Pullman-Standard v. Swint* and *Anderson v. City of Bessemer City, N.C.* Did Not Overrule Independent Appellate Review for Citizenship Cases**

Despite the Supreme Court's steadfast history of independent review for citizenship cases, the majority believes that *Pullman-Standard v. Swint*, 456 U.S. 273 (1982) and *Anderson v. City of Bessemer City*, *N.C.*, 470 U.S. 564 (1985) *impliedly* overruled these precedents and require us now to apply deferential review under Rule 52(a).[6] But how can this be so? For nearly seventy years the rule has been that independent appellate review is required to ensure that the government has met its high burden of proof when citizenship is at stake because of the significant rights and the severe consequences involved.

Neither *Pullman-Standard* nor *Anderson* implicitly overruled this well-established precedent for three reasons: (1) *Pullman-Standard* and *Anderson* held that a question of fact is subject to clear error review under Rule 52(a), but *Baumgartner* established that whether the government has met its heavy burden to revoke citizenship is a question of law; (2) the Supreme Court continues to rely on *Baumgartner*'s reasoning in distinguishing between questions of fact subject to Rule 52(a), and questions of law deserving independent appellate review; and (3) the Supreme Court's nearly seventy years of precedents requiring independent review for citizenship cases weigh heavily against the majority's conclusion that these precedents have been

---

[6] Rule 52(a) provides that for an action tried by the court instead of by a jury, the court must "find the facts specially," and on review, those factual findings will be set aside only if "clearly erroneous." Fed. R. Civ. P. 52(a)(1), (6).

impliedly overruled and swept away. I now address each point in turn.

First, the majority incorrectly presumes that *Baumgartner*, which established independent review for citizenship cases, involves a question of fact like *Pullman-Standard* and *Anderson*. It does not.

The Supreme Court has acknowledged "'the vexing nature'" of the distinction between questions of fact and questions of law. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984) (quoting *Pullman-Standard*, 456 U.S. at 288). Nevertheless, the difficulty in drawing the line "does not . . . diminish its importance." *Id.* "[T]he practical truth [is] that the decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of allocation as it is of analysis." *Miller v. Fenton*, 474 U.S. 104, 113–14 (1985). When Congress has not expressly spoken, "the fact/law distinction at times has turned on a determination that . . . one judicial actor is better positioned than another to decide the issue in question." *Id.* at 114. "Where the line is drawn varies according to the nature of the substantive law at issue." *Bose Corp.*, 466 U.S. at 501 n.17.

*Baumgartner* is an example of the Court making a determination, where Congress has not spoken, to designate an issue a question of fact or law. In *Baumgartner*, the Court articulated its standard of independent appellate review for what it described as a finding of "ultimate 'facts,'" which "clearly implies the application of standards of law." *Baumgartner*, 322 U.S. at 671. The Court noted that "the conclusion that may appropriately be drawn from the whole mass of evidence is not always the ascertainment of the kind

of 'fact' that precludes consideration by this Court." *Id.* At times, independent review, which is typically called "review of a question of law," is needed to review a finding that implies the application of standards of law. *Id.* Independent appellate review is particularly needed to review "broadly social judgments—judgments lying close to opinion regarding the whole nature of our Government and the duties and immunities of citizenship.'" *Id.*

*Baumgartner* concluded that a judgment concerning the loss of citizenship requires independent review. *Id.* The "importance of clear, unequivocal, and convincing proof, on which to [revoke citizenship] would be lost if the ascertainment by the lower courts whether that exacting standard of proof had been satisfied on the whole record were to be deemed a fact of the same order as all other facts, not open to review here." *Id.* (internal quotations and citation omitted). *Baumgartner* thus described whether the government has met its heavy burden as a question of law in light of the Court's determination that the appellate court is best suited to safeguard the precious right of citizenship. *See* Cooper, *supra*, 63 Notre Dame L. Rev. at 668 (explaining *Baumgartner* involved "law application").

In contrast, *Pullman-Standard* only held that the Federal Rules of Civil Procedure Rule 52(a) is applicable to "a pure question of fact," there, the finding of intentional discrimination. 456 U.S. at 288–89. Likewise, *Anderson* held that "[b]ecause a finding of intentional discrimination is a finding of fact," the district court's finding of discrimination is reviewed for clear error under Rule 52(a). *Anderson*, 470 U.S. at 573. In *Pullman-Standard* and *Anderson* the nature of the question at hand was clear. Congress has expressly provided that "the question of

intentional discrimination under § 703(h) [of Title VII of the Civil Rights Act of 1964] *is a pure question of fact*." *Pullman-Standard*, 456 U.S. at 286 n.16 (emphasis added).

Importantly, *Pullman-Standard* expressly distinguished *Baumgartner* as not involving a question of fact. *Pullman-Standard* explained that "*Baumgartner*'s discussion of 'ultimate facts' referred not to pure findings of fact—as we find discriminatory intent to be in this context—but to findings that 'clearly impl[y] the application of standards of law.'" *Pullman-Standard*, 456 U.S. at 286 n.16 (alteration in original) (quoting *Baumgartner*, 322 U.S. at 671). *Pullman-Standard* emphasized "discriminatory intent . . . is not a question of law and not a mixed question of law and fact." *Id.* at 289. Therefore, in *Pullman-Standard* and *Anderson*, the Supreme Court did not hold that Rule 52(a) applies to findings that imply the application of standards of law, as we have in this case, because no such finding involving law was before the Court.[7] Nor does *Pullman-Standard* and *Anderson* tell us anything about where the Court draws the line between a question of fact and law in citizenship cases because *Pullman-Standard* and *Anderson* involved a different area of substantive law—not the loss of citizenship.

*Pullman-Standard* and *Anderson* thus had nothing to do with the independent appellate review required for citizenship cases and did not implicitly overrule the Supreme Court's citizenship precedents. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (cautioning courts against concluding that "recent

---

[7] Rule 52(a) does not apply to conclusions of law. Fed. R. Civ. P. 52(a)(1), (6). Moreover, *Pullman-Standard* expressly stated that it was not addressing the applicability of Rule 52(a) to "mixed questions of law and fact." *Pullman-Standard*, 456 U.S. at 289 n.19.

cases have, by implication, overruled an earlier precedent"). Indeed, after *Pullman-Standard* and *Anderson*, the Supreme Court has continued to emphasize "the unusually high burden of proof in denaturalization cases" with reference to *Baumgartner*. *See Kungys v. United States*, 485 U.S. 759, 776 (1988) (citing *Baumgartner*, 322 U.S. at 670; *Schneiderman*, 320 U.S. at 158).

Second, the majority ignores that the Supreme Court has continued to apply *Baumgartner*'s reasoning in carving out substantive issues from the scope of Rule 52(a). In *Bose Corp. v. Consumers Union of United States, Inc.*, the Supreme Court addressed the proper standard of appellate review for the "determination that a false statement was made with the kind of 'actual malice'"[8] required in certain defamation actions. 466 U.S. at 487.

The Supreme Court's prior "cases raising First Amendment issues . . . ha[d] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record" to ensure that the judgment did not violate the right of free speech. *Id.* at 499 (internal quotations and citation omitted). The Court rejected the argument that Rule 52(a) eviscerates the appellate court's well-established independent review. *Id.* at 499–514. Independent appellate review for First Amendment cases "reflects a deeply held conviction that judges . . . must exercise such review in order to preserve the precious liberties established and ordained by the Constitution." *Id.* at 510–11. Consequently, notwithstanding Rule 52(a), an appellate court "must exercise

---

[8] Actual malice is "'knowledge that [a statement] was false or with reckless disregard of its truth or falsity.'" *Bose Corp.*, 466 U.S. at 491 (citation omitted).

independent judgment and determine whether the record establishes actual malice with convincing clarity." *Id.* at 514; *see also Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011) (quoting *Bose* in determining that reviewing courts make an "independent examination of the whole record" in First Amendment cases).

*Bose* demonstrates that the Supreme Court continues to embrace the heart of *Baumgartner*'s reasoning in making the distinction between a question of fact—and a question of law deserving independent review. As in *Baumgartner*, although the Supreme Court has referred to "actual malice as [an] 'ultimate fact,'" actual malice constitutes a finding implying the application of standards of law. *Bose Corp.*, 466 U.S. at 498 n.15; *id.* at 500–11 (listing cases where the court independently reviewed actual malice to ensure that the constitutional standard had been met). *Bose* quoted *Baumgartner*'s explanation of when independent review is justified for findings implying the application of standards of law:

> [T]he conclusion that may appropriately be drawn from the whole mass of evidence is not always the ascertainment of the kind of 'fact' that precludes consideration by [the appellate court]. Particularly is this so where a decision here for review cannot escape broadly social judgments—judgments lying close to opinion regarding the whole nature of our Government and the duties and immunities of citizenship.

*Id.* at 500 n.16 (citation omitted) (quoting *Baumgartner*, 322 U.S. at 670–71 and citing *Pullman-Standard*, 456 U.S. 286–87 n.16).

*Bose* concluded that whether actual malice has been established is a question of law in light of the Court's determination that the appellate court must safeguard First Amendment rights. *Id.* at 500–11; *see also Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 685 (1989) (stating "whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a *question of law*" (emphasis added)). Echoing the same principles in *Baumgartner* and its progeny, the Supreme Court emphasized that "the rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge." *Bose Corp.*, 466 U.S. at 501.

Just as independent review in First Amendment cases preserves the right of free speech established by the Constitution, independent review in citizenship cases preserves the "most precious right" of citizenship that "is expressly guaranteed by the Fourteenth Amendment to the Constitution." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963). Thus, *Bose* and its progeny tell us that the long history of an appellate court's obligation to conduct an independent review to protect the right of citizenship remains intact despite Rule 52(a).[9]

---

[9] The majority mischaracterizes *Bose* as narrowly applying independent review. Maj. at 12–13. The scope of independent review is governed by the constitutional issue at hand. *Bose Corp.*, 466 U.S. at 499–514; *Baumgartner*, 322 U.S. at 671. While independent review in *Bose* pertains to the constitutional issue of whether actual malice has been established, in citizenship cases independent review is necessarily broader because the constitutional issue is whether the burden of revoking citizenship has been met—the primary and only issue in this case.

Third, the majority disregards the Supreme Court's admonition that "[v]ery weighty considerations underlie the principle that courts should not lightly overrule past decisions." *Miller v. Fenton*, 474 U.S. 104, 115 (1985) (internal quotations and citation omitted); *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (instructing that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions").

For instance, in *Miller v. Fenton*, the Supreme Court held that "an unbroken line of cases, coming to this Court . . . forecloses the Court of Appeals' conclusion that the 'voluntariness' of a [criminal defendant's] confession merits something less than independent federal consideration." 474 U.S. at 112. The Supreme Court emphasized that "nearly a half century of unwavering precedent weighs heavily against any suggestion that we now discard the settled rule in this area." *Id.* at 115. Similarly, in *Ornelas v. United States*, the Supreme Court resolved a circuit split and held that under the Fourth Amendment, review of a warrantless search requires "independent appellate review of the[] ultimate determinations of reasonable suspicion and probable cause," which was the approach "consistent with the position we have taken in past cases." 517 U.S. 690, 695, 697 (1996). The Court underscored that in its prior precedents, the Court "ha[s] never, when reviewing a probable-cause or reasonable-suspicion determination ourselves, expressly deferred to the trial court's determination." *Id.* So too in *Bose*, the Supreme Court "reaffirm[ed] the principle of independent appellate review [for First Amendment cases]

that we have applied uncounted times before." *Bose Corp.*, 466 U.S. at 514.

The majority has failed to give due consideration to the over seventy years of unbroken precedents from the Supreme Court in citizenship cases. Time and time again, the Supreme Court has emphasized the preciousness and importance of citizenship and the crucial role of an appellate court's independent review. Had the Supreme Court intended to overrule the appellate court's deep rooted obligation to protect the right of citizenship, it would have said so.

## C. The First Circuit Has Held the Supreme Court's Citizenship Cases Have Not Been Overruled

In direct contrast to the majority's conclusion, our sister circuit, the First Circuit has concluded that independent review for denaturalization cases has not been overruled. Almost sixty years ago, the First Circuit held that *Baumgartner* did not suggest "that we might reverse only when we were of the opinion that the district court was 'clearly erroneous' in its conclusion" that the government has met its heavy burden of proof. *Cufari v. United States*, 217 F.2d 404, 408 (1st Cir. 1954). Instead, "[i]t is the duty of the court upon review of [denaturalization] cases . . . to examine the evidence in order to ascertain whether it meets [the requisite] high standard of proof." *Baghdasarian v. United States*, 220 F.2d 677, 680 (1st Cir. 1955).

The First Circuit affirmed independent review after *Pullman-Standard* and *Anderson*. In *United States v. Zajanckauskas*, "after looking at several Supreme Court cases in which the Court made clear that denaturalization cases are of an unusual nature," the First Circuit affirmed that in

denaturalization cases, "'while we accord weight to a district court's findings . . . , we do not weight those findings as heavily as we would in other cases of a civil nature.'" 441 F.3d 32, 37–38 (1st Cir. 2006) (quoting *Cufari*, 217 F.2d at 408). In so holding, the First Circuit expressly held that the Supreme Court's citizenship precedents "are still valid and have not been overruled in any way," and noted that *Anderson* "[had] nothing to do with denaturalization." *Id.* at 38 n.5. I agree with the First Circuit's sound reasoning.

For the foregoing reasons, I cannot accept the majority's conclusion that *Pullman-Standard* and *Anderson* overruled—by implication—*Baumgartner* and its progeny. It follows that our precedent, *Lim v. Mitchell*, which relies on *Baumgartner*'s progeny, controls the appellate standard of review in this case. Thus, we are required to conduct an independent review of the evidence in the record to determine whether that evidence is sufficient to satisfy the government's heavy burden to show by clear, unequivocal, and convincing evidence that Petitioner is a Mexican citizen, *not* a United States citizen. *See supra* Part III.A; *United States v. Gay*, 967 F.2d 322, 327 (9th Cir. 1992) (holding a "three-judge panel . . . cannot reconsider or overrule the decision of a prior panel" unless "an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point" (internal quotations and citation omitted)).

## IV. THE GOVERNMENT FAILED TO PROVE ITS CASE BY CLEAR, UNEQUIVOCAL, AND CONVINCING EVIDENCE

The district court correctly determined that Petitioner carried his initial burden of proving by a preponderance of the

evidence that he is an American citizen by the name of Reynaldo Mondaca. Petitioner's evidence demonstrating that he is Reynaldo Mondaca was as follows:

Petitioner testified that he is Reynaldo Mondaca Carlon, born in Imperial, California, on July 17, 1931 to parents Antonia Carlon and Marin Mondaca. Petitioner presented an authentic birth certificate for Reynaldo Mondaca Carlon.

Although born in California, Petitioner's parents took him back to Mexico, where he grew up in El Fuerte, Sinaloa, Mexico. Petitioner did not learn to speak English, only Spanish. In Mexico, Petitioner worked with his parents as a farmer.

When Petitioner was around 20 years old, he came back to the United States for the first time. In the United States, Petitioner worked in the fields, primarily with people from Mexico.

Petitioner then returned to Mexico. He learned that he was an American citizen when he was given his birth certificate by his mother. Petitioner used his birth certificate to come back to the United States, specifically, California and Washington.

It is undisputed that Reynoldo Mondaca applied for a social security card on May 23, 1953. The application indicated that his parents were Antonia Carlon and Marin Mondaca and that he was born on July 17, 1931, in Imperial, California. The parties also stipulated that "[a]ccording to handwriting analyses provided by experts for both parties, . . . the signature on the application ('Reynaldo C. Mondaca')

appears to be made by Petitioner."[10]   Petitioner's social
security card is under the name Reynaldo Mondaca, and
Petitioner has always used the Social Security number
associated with the card.  Petitioner qualifies for Social
Security benefits.

Petitioner met his wife (now deceased) in El Fuerte,
Mexico.  Petitioner and his wife had nine children, three of
whom were born in the United States.  Petitioner presented a
marriage certificate and baptismal certificates for his
children, all of which indicate that he is Reynaldo Mondaca.
Petitioner's passport, issued by the U.S. Department of State,
is also under the name Reynaldo Mondaca.

For several years after Petitioner and his wife were
married, Petitioner's wife and children lived in Mexico, while
Petitioner worked in California.  Petitioner would return to
Mexico about once a year to spend time with his family.
Eventually, Petitioner brought his entire family to the United
States.

In 1977, Petitioner's six children born in Mexico obtained
United States citizenship or Lawful Permanent Resident
status through Petitioner's status as a United States citizen.
Also in 1977, Petitioner's wife became a Legal Permanent
Resident based on Petitioner's status as a United States
citizen.

---

[10] In 1952 someone claiming to be Salvador Mondaca-Vega applied for
a social security card, but the government did not present any evidence
tying that application to Petitioner.  Unlike Reynaldo Mondaca's
application, Salvador Mondaca-Vega's application does not contain a
signature.

Because Petitioner established a prima facie case that he is an American citizen named Reynaldo Mondaca, the government was required to present clear, unequivocal, and convincing evidence that Petitioner *was not* who he claimed to be. Specifically, the government claimed that Petitioner is a Mexican citizen named Salvador Mondaca-Vega, who was born in El Mahone, Sinaloa, Mexico on June 3, 1931.[11]

Upon review of the record, I do not believe that the government met its high burden. The district court made numerous findings that are either not supported by the record or are based on speculation. Here are some examples.

1. As the majority recognizes and both parties agree, there is no evidence in the record to support the district court's findings that Petitioner was deported in July 1951, September 1951, and November 1952. Maj. at 24.

2. The majority concedes that the district court engaged in speculation when it determined that Petitioner was required to present his birth certificate when applying for a social security card in May 1953. Maj. at 24. That speculation is problematic. It led the district court to incorrectly conclude that Petitioner did not rightfully possess an authentic United States birth certificate.

The district court incorrectly reasoned that Petitioner would have had to obtain his birth certificate before applying

---

[11] The government contends that the "ultimate issue in this case is whether Petitioner is Salvador Mondaca-Vega . . . or Reynaldo Mondaca Carlon." *See also* Maj. at 25 (holding that "the district court's key finding, that Petitioner is Salvador Mondaca-Vega, is not clearly erroneous").

for his social security card. The district court took judicial notice of geographical distances to conclude that "[i]t would have been extremely difficult, if not impossible" for Petitioner to have retrieved a birth certificate from his mother in El Fuerte, prior to applying for a social security card in Calexico, California, on May 23, 1953. From there, the district court concluded that Petitioner must have obtained his Reynaldo Mondaca birth certificate "at some location near the border between the United States and Mexico on either May 22nd or May 23rd." There is no evidence in the record to support the district court's conclusion that Petitioner obtained his birth certificate in this manner. Rather, the only evidence in the record is that Petitioner obtained his birth certificate from his mother.

3. The district court further speculated that when Petitioner was detained by INS, Petitioner always had his birth certificate, and that Petitioner's failure to identify himself as Reynaldo Mondaca was "inexplicable." The district court seemed to believe that this is contrary to how an American citizen would act. But Petitioner, who does *not* speak English, stated he used an alias when he did *not* have his birth certificate and U.S. passport with him to show his United States citizenship. The district court speculated when it assumed what someone in Petitioner's position would or would not have done in the early 1950s. *See Chawla v. Holder*, 599 F.3d 998, 1006 (9th Cir. 2010) (holding that the "BIA's disbelief of Chawla's decision . . . was based on speculation and conjecture about what someone in Chawla's position would or would not do")*; Zhou v. Gonzales*, 437 F.3d 860, 865 (9th Cir. 2006) (holding that the IJ's "disbelief of Zhou's testimony was . . . based on speculation and conjecture about Zhou's position in Chinese society and what someone in that position would or would not do").

4. The district court also speculated that each time Petitioner was deported it was contrary to his financial interest, and thus, implausible that he would not have identified himself as an American citizen. The district court speculated that on July 28, 1953, it was "a busy time of year for an agricultural laborer," and thus, it would "not [have been] in the petitioner's financial interest to be removed from the United States at this time." Similarly, the district court presumed that when Petitioner was detained on September 15, 1954, there was "a great deal of agricultural work," and it "was in the petitioner's financial interest to remain in the United States." There is no evidence in the record to support the district court's findings regarding the employment opportunities for a farm worker, Petitioner's financial motives, or how conditions at the border were controlled in the early 1950s. *See United States v. Berber-Tinoco*, 510 F.3d 1083, 1091 (9th Cir. 2007) ("A trial judge is prohibited from relying on his personal experience to support the taking of judicial notice." (internal quotations and citation omitted)); *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1052 (9th Cir. 2002) (holding that "the IJ improperly substituted her own hypothesis for the evidence in the record" when she acknowledged that "Paramasamy was afraid to return to Sri Lanka" but "then speculated about Paramasamy's 'real' motives" including "'the anticipation of better job opportunities'").

5. Finally, the district court speculated that Petitioner began using the name Reynaldo Mondaca because of his marriage and his desire to obtain benefits. Not only is this finding not supported by the record, but the evidence demonstrates that Petitioner used his name Reynaldo Mondaca in 1953, almost twenty years prior to his marriage, when he applied for a social security card.

## V.  CONCLUSION

The majority incorrectly applies clear error review because of its erroneous conclusion that independent review for citizenship cases has been implicitly overruled.  On review of the record, because of the numerous findings based on speculation and findings unsupported by evidence, the government failed to prove by clear, unequivocal, and convincing evidence that Petitioner is a Mexican citizen whose name is Salvador Mondaca-Vega.  *See, e.g.*, *Lim*, 431 F.2d at 200 (holding that "although there was some evidence tending to show that appellant's family name was Jew rather than Lim, [the government] did not meet its burden of proving [attainment of citizenship through] fraud or error by clear, unequivocal and convincing evidence").  In fact, where, as here, there is "conflicting evidence" it cannot be said that the government has carried its burden to prove by evidence "which does not leave the issue in doubt" that Petitioner is Salvador Mondaca-Vega, and not Reynaldo Mondaca.  *Schneiderman*, 320 U.S. at 158 (internal quotations omitted).  Notably, the government did not present any evidence that anyone other than Petitioner has ever claimed to be Reynaldo Mondaca.

Even if the proper appellate standard of review here is for clear error, the district court clearly erred in finding that the government met its burden.  The majority contends that there was no clear error because "[s]ome of the challenged findings are not clearly erroneous" and that the "errors pertain to inconsequential points."  Maj. at 21, 24.[12]   As discussed

---

[12] The majority relies on *Societe Generale de Banque v. Touche Ross & Co. (In re U.S. Fin. Sec. Litig.)*, 729 F.2d 628 (9th Cir. 1984), to conclude that it may affirm the district court on any evidence that supports the

above, however, the district court's erroneous findings are numerous and central to the district court's conclusion that the government proved its case. I do not believe that the remaining findings are sufficient to satisfy the government's burden to prove by clear, unequivocal, and convincing evidence that Petitioner is Salvador Mondaca-Vega, a Mexican citizen. Thus, Petitioner is who he claims to be, an American citizen, Reynaldo Mondaca. I would GRANT the petition. Therefore, I dissent.

---

district court's judgment. Maj. at 24–25. In that case, the "basis for the court's decision provid[ed] a sufficient understanding of the issues without a remand for further findings." *In re U.S. Fin. Sec. Litig.*, 729 F.3d at 630. I do not believe that, absent the speculative and clearly erroneous findings, the basis of the district court's decision remains clear in this case.